JULIAN HAMMOND (SBN 268489)
jhammond@hammondlawpc.com
ADRIAN BARNES (SBN 253131)
abarnes@hammondlawpc.com
POLINA BRANDLER (SBN 269086)
pbrandler@hammondlawpc.com
ARI CHERNIAK (SBN 290071)
acherniak@hammondlawpc.com
HAMMONDLAW, P.C.
1201 Pacific Ave, 6th Floor
Tacoma, WA 98402
Tel. (310) 601-6766
Fax (310) 295-2385

*Attorneys for Plaintiff and the Putative Class*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **JONATHAN HOANG TO,** individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>**DIRECTTOU, LLC**, a Delaware Limited Liability Company,<br><br>Defendant. | Case No. 3:24-CV-06447-WHO<br><br>**DECLARATION OF JULIAN HAMMOND IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>Judge: Hon. William H. Orrick<br>Courtroom: 2<br>Hearing Date: December 18, 2024<br>Hearing Time: 2:00 p.m. |

I, Julian Hammond, declare as follows:

1. I am a member in good standing of the Bar of the State of California and counsel of record for the Plaintiff in the above-captioned matter and the putative Settlement Class. I make this declaration based on personal knowledge and, if called as a witness, I could and would testify competently to the matters set forth herein.

2. I submit this declaration in support of Plaintiff's Motion for Preliminary Approval of the Class Action Settlement. A true and correct copy of the Settlement Agreement, which has been executed by the parties, is attached hereto as **Exhibit 1**. Annexed as exhibits to the Settlement Agreement are the following documents:

- Exhibit A – Claim Form
- Exhibit B – Email Notice
- Exhibit C – Long-Form (Settlement Website) Notice
- Exhibit D – Proposed Preliminary Approval Order
- Exhibit E – Proposed Final Approval Order

## I. INTRODUCTION

3. Plaintiff has achieved an impressive result in this case less than three months after filing his lawsuit, despite facing risks of having his claims be compelled to individual arbitration, risks of losing on class certification, as well as risks on the merits based on Defendant's arguments, including that users consented to the practice at issue, that customers' personal information was not actually disclosed, and that the putative class member sugared no actional damages.

4. Defendant has agreed to pay $1,750,000 to resolve this action. The $1,750,000 cash settlement, after deduction of Court-approved attorneys' fees and costs, administration expenses, and service award, will be allocated pro rata to all Class Members who submit a valid Claim Form.[1] The cash settlement represents an average per-Class Member monetary settlement of $6.01 gross and $4.01

[1] The use of the Claim Form makes it more likely that a greater proportion of the settlement funds distributed will actually be received and redeemed by the Class Members. And, the use of the Claim Form allows the use of electronic payments (through selection of electronic payment and provision of required information for e-payment on the Claim Form), which will likely help reduce fraud in the receipt of settlement funds through the mail and allow for means of distribution that are less expensive than printing and mailing a physical check.

net and, assuming a 5% claims rate anticipated by the Plaintiff and the proposed Settlement Administrator, the average recovery per Settlement Class Member who submits a claim will be $120.22 gross, and $80.21 net. This represents significant monetary relief for Settlement Class Members, and is well above the average recovered in comparable cases.

5. In addition, Plaintiff also obtained key non-monetary relief for the benefit of the Class (and all future customers of Defendant) by getting Defendant to remove all tracking tools from its websites, including the Meta Pixel and the "Facebook like button", days after entering into the Settlement Agreement (even before preliminary approval), and by getting Defendant to agree, in the Settlement Agreement, to cease sharing its customers' personal viewing information, except as permitted under the VPPA and/or California law. Through confirmatory discovery Plaintiff was able to confirm that its customers' information is no longer available for purchase on Next Mark's website and that data is no longer available to data brokers or data aggregators. This prospective relief is also similar to the non-monetary relief achieved in other VPPA cases.

6. The Settlement Class consists of an estimated 291,128 individuals who are "all persons who reside in the United States, purchased a video or videogame from Defendant or signed up to receive notices about videos or videogames from Defendant, and about whom information which identified such persons as having requested or obtained specific video materials or services from Defendant may have been disclosed to a third party between August 8, 2022 and the date of Preliminary Approval." The "Settlement Class" also includes 35,247 California subclass members who are "all persons who reside in California, purchased a video or videogame from Defendant or signed up to receive notices about videos or videogames from Defendant, and about whom information which identified such persons as having requested or obtained specific video materials or services from Defendant may have been disclosed to a third party between August 8, 2020 and the date of Preliminary Approval."

7. The settlement is a product of arm's-length settlement negotiations and is informed by extensive investigation and research on the part of Plaintiff's Counsel, data and information obtained as part of informal discovery, Plaintiff's counsel's experience in litigating and settling similar privacy cases, and Plaintiff's counsel's analysis of similar VPPA settlements. Based on their experience,

analysis, research and investigation, Plaintiff's counsel consider this Settlement to offer a very substantial benefit to the Settlement Class and to be overall an excellent result.

## II. SUMMARY OF THE LITIGATION

8. On August 8, 2024, Plaintiff To filed this putative class action lawsuit in the Superior Court for the County of Alameda, alleging that Defendant secretly disclosed its California customers' confidential video purchase information to Meta Platforms, Inc. ("Meta" or "Facebook"), an unauthorized third party without its customers' written informed consent. Plaintiff alleged that Defendant's customers were shown no disclaimer or warning that their confidential information would be disclosed to any unauthorized third party, had no idea that their confidential information was being collected and transmitted to an unauthorized third party because the tracking tools embedded on Defendant's website were not visible to the customers, and never consented to Defendant's conduct. Plaintiff alleges that DirectToU secretly transmitted their data to Meta for economic gain because there is a well-established national and international market for consumers' confidential information.

9. Defendant removed the case to this Court on September 12, 2024.

10. On October 1, 2024, Plaintiff filed a First Amended Complaint, which retained Plaintiff's allegations and added a national Class.

11. Defendant's deadline to respond was extended first by motion and subsequently by a stipulation of the parties.

12. On October 23, 2024, the parties reached an agreement in principle to resolve Plaintiff's class claims.

13. On November 1, 2024, Plaintiff filed a Second Amended Complaint to conform to the terms of the Settlement Agreement, pursuant to the parties' stipulation.

## III. SUMMARY OF RESEARCH, INVESTIGATION, AND INFORMAL DISCOVERY

14. As briefly discussed above, prior to filing this lawsuit Plaintiff's counsel conducted extensive and thorough investigation into the factual and legal basis of this lawsuit, and Plaintiff's counsel continued to investigate the case, including through obtaining data and information from Defendant as part of informal discovery.

15. Specifically, Plaintiff Jonathan Hoang To first discussed this case with Plaintiff's counsel and agreed to represent the Class in April 2024. Prior to filing the complaint, Plaintiff's counsel spent many hours thoroughly researching and considering the relevant facts and law. Plaintiff's counsel analyzed Defendant's websites (www.deepdiscount.com, www.ccvideo.com, www.moviesunlimited.com) for presence of tracking tools, reviewed the steps consumers were required to take to sign up for an account with Defendant and/or make purchases, as well as other information available on Defendant's websites. Plaintiff's counsel also reviewed information provided by Plaintiff about his purchases and reviewed changes to Defendant's website over time including changes to Defendant's Terms of Use and Privacy Policy and changes to how the Facebook/Meta Pixel was configured throughout the relevant period, by reviewing historic versions of Defendant's website available on the internet archive known as the "Wayback Machine." Plaintiff's counsel analyzed dozens of orders on motions to dismiss and summary judgment motions in VPPA cases both in and outside this district.

16. As part of their analysis of Defendant's website, Plaintiff prepared screenshots using the "Meta Pixel Helper" that showed the sharing of Defendant's customer's video DVD and Blu-ray purchase data with Meta.

17. Plaintiff's counsel subsequently retained an expert to confirm their findings concerning the presence of tracking tools on Defendant's website and the configuration of the tracking tools, and provided their findings and analysis to Plaintiff's Counsel. Plaintiff's expert also prepared HAR files that evidenced the sharing of Defendant's customers' DVD and Blu-ray purchase data with Meta.

18. Finally, Plaintiff obtained key information and data as part of informal discovery, including the size of the national Class and the California subclass, information about when the pixel was first installed on Defendant's websites.

19. Following settlement, Plaintiff obtained agreement from Defendant to remove all tracking tools, including the Facebook Pixel and the Facebook like button from its websites (www.deepdiscounts.com, www.ccvideo.com, www.unlimitedmovies.com), before preliminary approval (and before the time required by the Settlement Agreement). Plaintiff's counsel then directed their expert to test Defendant's websites to confirm that Defendant had removed tracking tools.

Plaintiff's expert confirmed to Plaintiff's counsel that Defendant has removed both the Meta Pixel and the Facebook like button from its websites. Plaintiff also ascertained through confirmatory discovery that the lists containing Defendant's customer information had been removed from www.nextmark.com and are not available to any data brokers.

## IV. SETTLEMENT WAS A PRODUCT OF INFORMED, ARMS'-LENGTH NEGOTIATIONS

20. Plaintiff's counsel was well-informed of the strength and weaknesses of Plaintiff's claims and well prepared to negotiate the settlement based on their legal and factual research and investigation in this case, their experience in litigating and settling similar privacy cases, and analysis of dozens of VPPA settlements.

21. Shortly after Defendant removed the case to this Court, the parties began to engage in settlement discussions. As part of engaging in settlement discussions Defendant provided data and documents, including the estimated size of the Class and of the California Subclass. Settlement negotiations were arms'-length. The parties exchanged a number of offers and counteroffers that included both monetary relief and the terms of prospective relief. On October 19, 2024, the Parties reached a settlement in principle and then continued to negotiate and resolve numerous details associated with finalizing the Settlement, including the Notice Plan, the appropriate allocation of the Settlement Fund among Class Members, the claims process, and the distribution plan.

22. On October 23, 2024, the Parties executed the Class Action Settlement Agreement, which is now presented to this Court for approval.

23. The Parties agreed to the Settlement Agreement without ever discussing any settlement negotiations between Defendant and any other party, including plaintiffs in the *Feller, et al. v. Alliance Entertainment, LLC, et al.*, No. 0:24-cv-61444-RAR (S.D. Fla.) case. There is no arrangement between Plaintiff's counsel in this case and the counsel for plaintiffs in the *Feller* case.

## V. THE STRENGTH AND RISKS OF PLAINTIFF'S CASE

24. Plaintiff believes his claims have merit and that he would prevail at trial. Nevertheless, Plaintiff acknowledged that he faced a number of risks, including the risk that his claims would be compelled to individual arbitration, that he would not be able to certify the Class, that he would lose on the merits, and that, even if he cleared the arbitration hurdle, certified the class and prevailed on the

merits, the Court would cut statutory damages in the exercise of its discretion or find that the Class Members was entitled to no more than what they actually paid to Defendant.

**1. <u>Defendant's Affirmative Defenses</u>**

***a. Arbitration Risk***

25. Plaintiff disputes the enforceability of Defendant's arbitration agreement, but recognizes that he faced a substantial, concrete and material risk that Defendant would be able to compel his claims to individual arbitration. The Terms of Use for each of Defendant's websites contain an arbitration provision, with a class action waiver, which purports to require individual arbitration of any claim Plaintiff might bring against Defendant. Defendant could argue that Plaintiff (and other Class Members) consented to the arbitration agreement in Defendant's Terms of Use because they were required to agree to Defendant's Terms of Use when signing up for an account or purchasing videos or videogames on Defendant's websites.

26. If Defendant successfully compelled Plaintiff's claims to individual arbitration, it would leave Plaintiff with no means of obtaining class relief, and class members would be highly unlikely to pursue recover on an individual basis. Thus, Plaintiff believes that this risk warranted a substantial discount on all claims for settlement purposes.

***b. Risk of Recovery Being Limited to Amounts Paid***

27. Plaintiff also faced the risk that the Court would limit damages to amounts paid by the Class Members based on the damages limitation clause in Defendant's Terms of Use on each of Defendant's websites. That clause purports to limit customers' recovery from Defendant to the purchase price paid by customers to Defendant.

28. Plaintiff believes that this provision would be found to be unconscionable (whether Plaintiff's claims proceeded in court or in arbitration) because, if enforced, it would deprive Plaintiff and other Class Members of their statutory rights. However, Plaintiff recognizes that this provision presents litigation risk in that, if Defendant successfully enforced this provision, it would dramatically reduce potential recovery.

***c. Risk of Losing on Class Certification***

29. While Plaintiff is confident that he would be able to certify the class, he is also keenly

aware that if the settlement had not been reached, Defendant was prepared to present arguments that multiple individualized inquiries would preclude certification. For example, some customers may have used browsers and other tools which prohibited or limited the disclosure of their PII to Meta and other third parties. The ultimately outcome of a contested class certification motion would be uncertain. The risk of non-certification presents the same concerns as the risk of Plaintiff's claims being compelled to individual arbitration in that class members would be highly unlikely to pursue individual relief.

***d. Risk of the Court finding that Plaintiff Lacks Article III Standing***

30. Absent settlement, Defendant would argue that Plaintiff could not asserts claims against Defendant because he lacks Article III standing. Defendant would likely argue that Plaintiff suffered only a statutory harm and cannot meet Article III's injury-in-fact requirement.

31. Plaintiff is confident that he would be able to establish standing, but acknowledges that this poses another risk to recovery.

**2. <u>The Strength and Risks of Plaintiff's VPPA Claim</u>**

32. Plaintiff believes he would successfully establish that Defendant violated the VPPA by disclosing his and other Class Members' information that identified them "as having requested or obtained specific video materials or services" from Defendant, without their informed, written consent.

33. Defendant could argue that Plaintiff and Class Members consented to the disclosure of this information because they (purportedly) consent to Defendant's Privacy Policy at the same time they consent to Defendant's Terms of Use on one or more of Defendant's websites. But, Plaintiff believes that Defendant's argument would fail because the VPPA sets out specific, detailed requirements for written consent including that: (1) the written consent must be "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer;" (2) "at the election of the consumer" the consent must be either "given at the time the disclosure is sought" or "given in advance for a set period of time, not to exceed 2 years or until consent is withdrawn by the consumer, whichever is sooner;" and (3) the video tape service provider must provide "an opportunity, in a clear and conspicuous manner, for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election." 18 U.S.C. § 2710(b)(2)(B)(i)-(iii).

34. Plaintiff recognizes, however, that Defendant's primary defense to Plaintiff's VPPA claim would focus on the potential difficulties Plaintiff would encounter in establishing whether any specific Class Member's information was disclosed via tracking tools or was sold or otherwise disclosed to data brokers and other third parties. Plaintiff's counsel believes that these difficulties would stem in part from the fact that obtaining discovery from Meta, in their experience, is challenging. And, Plaintiff's counsel are mindful of the similar challenges faced when seeking to obtain information data brokers. Although, Plaintiff believes he could overcome these challenges, he recognizes them as posing substantive risk to recovery on this claim.

35. Based on these risks, Plaintiff's counsel evaluated Plaintiff's claims for settlement as follows. Plaintiff seeks statutory damages of $2,500 per Class Member, pursuant to section 2710(c), for a total maximum exposure on this claim of $727,820,000 (291,128 Class Members x $2,500).

36. Plaintiff expects that Defendant would contend that this figure would be subject to a due process challenge as disproportionate to the injury and goals of the statute. In addition, Defendant could argue that the damages under the VPPA are discretionary because the statute uses the word "may" in section 2710(c)(2)(A).

37. Based on the above, Plaintiff believes that a fair estimate of recoverable damages could be based on the value of the personal data allegedly disclosed. Based on Plaintiff's review of similar VPPA cases and U.S. consumer survey results that measures how consumers value their data, presented a paper presented to PrivacyCon 2020 hosted by the Federal Trade Commission, Plaintiff viewed the value of the data disclosed as around $5 per Class Member. Even assuming recoverable damages of $20 per Class Member (four times that suggested by other cases and consumer surveys), Defendant's exposure is $5,822,560 (291,128 x $20). A true and correct copy of "How Much is Privacy Worth Around the World and Across Platforms?", Jeffrey Prince, March 2020, is attached as **Exhibit 2**.

38. Plaintiff recognizes that this more reasonable measure of damages ($5,822,560) is then subject to discounts for settlement purposes based on all the risks discussed above, including the risk of individual arbitration or losing on class certification, of recovery being limited to the amount paid to Defendant, and various other merits-risks. Accordingly, Plaintiff applied a 50% discount for these risks and thus estimated Defendant's realistic exposure on this claim at $2,911,280.

**3. The Strength and Risks of Plaintiff's Cal. Civil Code § 1799.3 Claim**

39. Plaintiff conduced similar analysis of his Cal. Civ. Code § 1799.3 claim, as of his VPPA claim. The only difference is that Defendant has an additional potential defense against Plaintiff's § 1799.3 claim, which is based on the statute's "willful violation" provision, as opposed to VPPA's lower level of scienter "knowing" disclosure provision.

40. Similarly to Plaintiff's claim under the VPPA, the potentially total maximum exposure is massive. Pursuant to § 1799.3(c), for each willful violation, a Class Member can recover a civil penalty of $500. Even assuming that each Class Member can recover only $500 (rather than $500 for each purchase from Defendant or for each time his or her PII was disclosed), Defendant's theoretical exposure is $17,623,500 (35,247 California Subclass Members x $500). Plaintiff expects that Defendant would argue that this figure raises significant due process concerns. Thus, Plaintiff views a reasonable estimate of potential maximum damages as one that is based on at most $20 for each California sub-class Member, which results in maximum recovery of approximately $704,940 (35,247 California Subclass Members x $20).

41. The $704,940 exposure is subject to all the risks of arbitration and non-certification discussed above, as well as the risk of recovery being limited to the amounts paid by Class Members, and merits-risks discussed immediately above. Based on these risks, Plaintiff applied a 50% discount for settlement purposes and thus estimates Defendant's realistic exposure on this claim at $352,470.

42. In addition, a discount is warranted given the strength of the VPPA Claim and because the Court might not permit a substantial recovery under § 1799.3 as it is based on the same underlying conduct as Plaintiff's VPPA claim and seek similar type of relief (a civil penalty that is akin to liquidated damages provided by the VPPA).[2] Thus, Plaintiff considers Defendant's realistic aggregate exposure on all three claims to be similar to, and dependent on, Defendant's exposure to Plaintiff's VPPA claim.

///

[2] Given that the UCL claim is derivate of Plaintiff's other claims and given the strength of his main claims, Plaintiff thinks that his UCL claim would only entitle him to the same relief available under the underlying statutes but would allow him to extend the claims of California Subclass members back to four years prior to the filing of the Complaint (as opposed to two years for the nationwide Class). Accordingly, Plaintiff ascribes only *de minimus* monetary value to his UCL claim.

## VII. RISK OF FURTHER LITIGATION

43. The risks described above, including the risk of arbitration, non-certification, and on the merits, mean that there is no guarantee that Plaintiff would recover anything if he continued to litigate the case. Further litigation would also be time consuming, complex, involve extensive motion practices, and could take years to resolve and would likely involve appeals.

44. If Plaintiff succeeded in opposing Defendant's efforts to compel their case to individual arbitration, litigation would likely continue for many years. Plaintiff would have to clear the hurdles of class certification and summary judgment. The losing party would appeal the Court's ruling on one or both of those matters. The Parties would then likely seek a lengthy jury trial. The case would almost certainly not end with a jury verdict; given the relatively unsettled nature of relevant precedent and the magnitude of Defendant's potential exposure, one or both Parties would almost certainly appeal. Plaintiff's counsel would incur substantial costs which would ultimately be deducted from the Class recovery, and still, the result would be uncertain.

## VIII. THE SETTLEMENT REPRESENTS AN EXCELLENT RESULT

45. Defendant has agreed to pay $1,750,000 to settlement claims of 291,128 Class Members (which includes 35,247 California Subclass Members). As discussed above, this represents gross per-Class Members recovery of approximately $6.01 and net recovery of approximately $4.01. Assuming a claims rate of 5%, the gross share of the cash settlement fund available to each Settlement Class Member submitting a valid claim will be approximately $120.22, and their net share of the cash settlement fund (after the payment of court-approved attorneys' fees and costs, Class Representative Service Award, and Settlement Administration Costs) will be $80.21. This recovery compares very favorably with the relief available to claimants in consumer actions in general and in VPPA settlements. In fact, the monetary relief in this case places this case toward the high end of the range of court-approved settlements in similar cases. *See* **Exhibit 3** attached hereto.

46. In addition, the Settlement Agreement provides key prospective/injunctive relief that addresses and resolves the alleged legal wrongs that promoted the suit. The Settlement Agreement requires Defendant to comply with the VPPA and § 17993 and for Defendant to "modify the Facebook Pixel settings on Defendant's Website so that specific product information is not shared with Facebook.

Additionally, Defendant will not knowingly share information which identifies a person as having requested or obtained specific video materials or services with third parties, except as permitted by the VPPA." Settlement Agreement, ¶ 2.2.

47. Under the Settlement, Defendant must implement these business-practice changes within 45 days of the entry of the Preliminary Approval Order. Plaintiff is pleased with the fact that he already got Defendant to remove tracking tools, including the Meta Pixel and the Facebook like button, from Defendant's websites. In addition, through confirmatory discovery Plaintiff was able to confirm that its customers' information is no longer available for purchase on Next Mark's website and that data is no longer available to data brokers or data aggregators.

48. Plaintiff's counsel believes that the combined monetary and prospective relief (an important part of which has already been implemented by the Defendant) represents an excellent result for the Class (and the California Subclass) and achieves important goals of this lawsuit. The result is particularly excellent given that Plaintiff's claims rest on novel theories or unsettled areas of law and Plaintiff faced several risks if litigation continued, including the risk of losing on class certification and/or on the merits.

## IX. CLASS COUNSEL'S EXPERIENCE

49. HammondLaw attorneys have extensive class action and complex litigation expertise. Our attorneys have consistently won unprecedented recoveries for consumers as well as employees, obtained crucial injunctive relief, caused changes in industry standards, and even caused the California Legislature to pass new legislation. Their extensive experience and expertise were instrumental in securing the excellent result in this case. HammondLaw's firm resume is attached as **Exhibit 4** hereto.

50. **Julian Hammond** has more than twenty years of experience in commercial and complex class litigation. Having been a Barrister in Australia, representing GlaxoSmithKline in the then-largest commercial litigation in Australia's history, Mr. Hammond transitioned his practice to California in 2010 and founded his own law firm, and has since become a leading California class action attorney. Mr. Hammond has obtained over 40 class action settlements and judgments over just the past 3 years, securing over $50 million in settlements for employees and consumers (and close to $100 million since 2010 in more than 80 class actions). Included among these was Mr. Hammond's success, with Ms.

Brandler as second chair, securing judgment in a class action against the University of San Francisco in 2020, and his successful defense of that judgment before the Court of Appeal in 2023. Also notable was a $16.5 million settlement for approximately four million consumers against Apple in relation to its automatic renewal policies. Recently, Mr. Hammond has begun representing consumers and patients in various data privacy cases, including in cases against Cerebral, Inc., TaxAct, BetterHelp, NFHS Network, Watch AFL, Watch NRL, and BBC America for disclosing their customer's medical, financial, and video viewing information to Meta through the Pixel.

51. Mr. Hammond earned his bachelor's degree from the University of New South Wales, and his J.D., *summa cum laude,* from the University of Technology. Mr. Hammond also received an LLM from New York University School of Law in 2001.

52. **Adrian Barnes** has over 12 years of experience successfully representing consumers and employees in class-action cases. Adrian is currently pursuing litigation against a number of leading financial, video and healthcare companies for the unauthorized disclosure of customers' confidential financial, medical and viewing information. Adrian has represented clients before the National Labor Relations Board, the Public Employment Relations Board, and has litigated class actions to the Supreme Court. He has also obtained favorable settlements in multi-million-dollar class actions under California's wage and hour laws.

53. Adrian earned his law degree from Columbia Law School, where he was on the editorial board of the Columbia Law Review, was a James Kent Scholar, and received the Emil Schlesinger Prize for the student most proficient in labor law. Prior to law school, Adrian earned a bachelor's degree in Rhetoric from the University of California, Berkeley, where he graduated *magna cum laude*, and a master's degree in English Literature from University College London.

54. **Polina Brandler** has over 11 years of complex class action experience and a total of 15 years of legal experience, having spent the first two and a half years of her career as a judicial law clerk. Ms. Brandler has a wealth of litigation experience, having litigating over 30 class actions, and worked on every stage of litigation, from case researching and investigation, pleadings and motion practice, expert discovery to depositions, through to mandatory settlement conferences and mediations, and recently successfully second chaired a class action trial against the University of San Francisco.

Additionally, Ms. Brandler brings her formidable briefing skills to the table, being responsible for numerous motions and oppositions, including oppositions to motions to compel arbitration, and recent appellate briefs, in which HammondLaw was successful.

55. Ms. Brandler received her bachelor's degree, *cum laude*, in 2005 from Macaulay Honors College at the City University of New York, and her J.D. from the Benjamin N. Cardozo School of Law in 2009.

56. **Ari Cherniak** has been with HammondLaw since 2010 and has extensive class action litigation experience. Mr. Cherniak's assists in managing all aspects of the class action litigation at HammondLaw, including overseeing case calendars, advising on compliance with applicable rules including procedural rules, local rules, standing orders, and guidelines, and ensures the smooth operation of the cases from inception through to final approval. Mr. Cherniak has been appointed along with other members of the HammondLaw Team as class counsel in over 70 class actions since 2010.

57. Mr. Cherniak received his bachelor's degree from Towson University in 2007, and his J.D. from Tulane University Law School in 2011.

58. **Steven Greenfield** has over seven years of legal experience, and over 20 years of professional experience. In the last two years, Mr. Greenfield has focus his practice on litigating privacy cases.

59. Mr. Greenfield earned his bachelor's degree from Yeshiva University in 1996, where he was valedictorian from the Sy Syms School of Business, his J.D. from the University of Pennsylvania Law School in 1999, where he graduated in the top 25% of his class, an LLM in taxation from the New York University School of Law in 2002, and an MBA from Columbia University in 2007.

## X. ATTORNEYS FEES AND COSTS

60. Plaintiff will seek attorneys' fees in an amount of 25% of the Settlement Fund.

61. As of November 4, 2024, Plaintiff's counsel have spent more than 200 hours working on this case for a total lodestar of over $140,000 and will expend additional hours before their submission of a request for an award of attorneys' fees and before final approval is granted.

62. Plaintiff's counsel will expend additional hours preparing for and appearing at the preliminary approval hearing, overseeing the notice process, including working with the Settlement

Administrator on monitoring claims rates and on sending out reminder notices, responding to questions from the Class Members, submitting preparing and filing the motion for final approval, responding to objections, preparing final approval motion, attending the final approval hearing, and overseeing the distribution of the settlement funds.

## XI. COSTS

63. Plaintiff's counsel has incurred $9,275.95 in costs and expenses in this litigation through to November 3, 2024. The following is a summary of these expenses, identified by the category of expense and the amount incurred:

| **Category** | **Total Amount** |
|---|---:|
| Court Filing and Service Fees | $1,446.95 |
| Consulting expert fees | $2,250.00 |
| Research (Pacer, Lexis/Westlaw) | $5,579.00 |
| **Grant Total** | **$9,275.95** |

## XII. PROPOSED SETTLEMENT ADMINISTRATOR

64. The parties propose Angeion Group, LLC, as the settlement administrator. The parties choose Angeion as the settlement administrator for this action after a competitive selection process involving solicitation of bids from Angeoin and one other, well-known, settlement administrator. The two settlement administrators each proposed generally similar notice and claims processes to the one the parties ultimately selected. Given that Class Members engaged in online transactions with Defendant and given that Defendant has email addresses for the substantial majority of the Class, direct notice will be provided by email, with two reminder notices after the initial notice.

65. Counsel for both parties independently evaluated each proposal and then conferred with each other regarding the selection of the case administrator. Counsel then agreed to select Angeion as the settlement administrator.

66. The parties agreed to choose Angeion based on extensive experience of their principles in administering settlements, including settlements in this district, their stellar reputation and sophistication in carrying out notice programs in large consumer cases, claims rates they achieved in similar consumer settlements, and its competitive pricing.

///

## XIII. PLAINTIFF'S EFFORTS ON BEHALF OF THE CLASS

67. Plaintiff To has agreed to take on the responsibility of representing the Class and has devoted substantial time and effort to this case. He discussed his claim with Plaintiff's Counsel, reviewed and readily accepted his duties as a Class Representative, reviewed documents filed in this case, promptly responded to calls and emails from Plaintiff's Counsel, looked for and shared documents with Plaintiff's Counsel, and was actively involved in the case.

68. Plaintiff's claims are typical of the claims of the other Class Members and his interests are aligned with, and not antagonistic to, those of the other Class Members. Without his involvement and his willingness to represent the Class, this case and this settlement would not have been possible.

## XIV. CY PRES BENEFICERARY

69. The parties' Settlement Agreement in the above-captioned case identifies the Electronic Privacy Information Center ("EPIC") as the parties' chosen cy pres recipient.

70. EPIC is a nationwide organization which addresses myriad issues affecting American consumers. It describes itself as a "public interest research center… seeking to protect privacy, freedom of expression, and democratic values in the information age."

71. Among the issues addressed by EPIC which are relevant to the Class Members' claims in the instant case are: advocacy for consumer data protection; advocacy for consumer privacy; and work on comprehensive privacy laws.

72. Neither Plaintiff nor any attorney or employee at HammondLaw has any relationship with EPIC. There is no connection between Plaintiff or Plaintiff's Counsel, on the one hand, and EPIC, on the other, that could create the impression of any impropriety of any sort in the selection of EPIC as the cy pres recipient in this case.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on November 5, 2024.

/s/ Julian Hammond
Julian Hammond