1  JULIAN HAMMOND (SBN 268489)
   jhammond@hammondlawpc.com
2  ADRIAN BARNES (SBN 253131)
   abarnes@hammondlawpc.com
3  ARI CHERNIAK (SBN 290071)
   acherniak@hammondlawpc.com
4  POLINA BRANDLER (SBN 269086)
   pbrandler@hammondlawpc.com
5  HAMMONDLAW, P.C.
   1201 Pacific Ave, 6th Floor
6  Tacoma, WA 98402
   (310) 601-6766 (Tel.)
7  (310) 295-2385 (Fax)

8  *Attorneys for Plaintiff and the Putative Class*

9

10                    **UNITED STATES DISTRICT COURT**

11                  **NORTHERN DISTRICT OF CALIFORNIA**

12  **JONATHAN HOANG TO,** individually and )   Case No. 3:24-CV-06447-WHO
    on behalf of all others similarly situated,   )
13                                                 )   **PLAINTIFF'S REPLY MEMORANDUM**
              Plaintiff,                           )   **IN SUPPORT OF AND MOTION FOR**
14                                                 )   **PRELIMINARY APPROVAL OF CLASS**
          vs.                                      )   **ACTION SETTLEMENT**
15                                                 )
    **DIRECTTOU, LLC,** a Delaware Limited )   Judge:      Hon. William H. Orrick
16  Liability Company,                             )   Courtroom:  2 – 17th Floor
                                                   )   Hearing Date: Dec. 4, 2024
17            Defendant.                           )   Hearing Time: 2:00 p.m.
                                                   )
18                                                 )
                                                   )
19                                                 )
                                                   )
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................................................1

II.   ARGUMENT .........................................................................................................................2

    A.    PROPOSED INTERVENORS' UNFOUNDED ALLEGATIONS OF COLLUSION AND A REVERSE AUCTION SHOULD BE DISREGARDED ........................................................................................2

    B.    THE SETTLEMENT IS AN EXCELLENT RESULT FOR THE SETTLEMENT CLASS ........................5

    C.    THE PROPOSED SETTLEMENT DOES NOT GIVE PREFERENTIAL TREATMENT TO CALIFORNIA RESIDENTS ..............................................................................................................8

    D.    THE SETTLEMENT IS NOT DEFICIENT ..............................................................................10

        1.    PROPOSED INTERVENORS' OBJECTION TO THE DEFINITIONS OF RELEASED CLAIMS AND RELEASED PARTIES IS UNFOUNDED .................................................................10

        2.    THE USE OF A CLAIM FORM IS INTENDED TO BENEFIT THE CLASS ...........................13

        3.    THE PROPOSED CLASS NOTICES ARE MORE THAN ADEQUATE .................................13

        4.    THE SETTLEMENT ADMINISTRATOR WAS SELECTED AS PART OF AN ADEQUATE AND APPROPRIATE COMPETITIVE BIDDING PROCESS ........................................................14

III.  CONCLUSION....................................................................................................................15

# TABLE OF AUTHORITIES

**Cases**

*Boelter v. Advance Mag. Publishers Inc.*, 210 F. Supp. 3d 579 (S.D.N.Y. 2016) ................................. 6

*Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251 (11th Cir. 2015) ............................................. 6

*G.F. v. Contra Costa County,* 2015 WL 7571789 (N.D. Cal. Nov. 25, 2015) ..................................... 12

*Guzman v. Polaris Industries*, 49 F. 4th 1308 (9th Cir. 2022) .................................................. 9

*Halaburda v. Bauer Publ'g Co.*, 2013 WL 4012827 (E.D. Mich. Aug. 6, 2013) ............................... 7

*In re Natera Prenatal Testing Litig.*, 664 F. Supp. 3d 995 (N.D. Cal. 2023). ...................................... 10

*Keller v. Nat'l Collegiate Athletic Association (NCAA)*, 2015 WL 5005901 (N.D. Cal., Aug. 19, 2015) ................................................................................................................ 13

*Korea Supply Co. v. Lockheed Martin*, 29 Cal. 4th 1134 (2003) ................................................. 10

*Kuhr v. Mayo Clinic Jacksonville,* 530 F.Supp.3d 1102 (M.D. Fla. 2021) .................................... 5

*Lin v. Crain Commc'ns Inc.*, 2020 WL 248445 (E.D. Mich. Jan. 16, 2020) .................................. 6

*Noell Crane Systems GmbH v. Noell Crane and Service, Inc.,* 677 F. Supp. 2d 852 (E.D. Va. Dec. 21, 2009) ...................................................................................................................... 12

*Pratt v. KSE Sportsman Media, Inc.*, 586 F. Supp. 3d 666 (E.D. Mich. 2022) ............................. 6

*Roffman v. Rebbl, Inc.*, 653 F. Supp. 3d 723 (N.D. Cal. 2023) ............................................... 10

*Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618 (7th Cir. 2014) .................................... 6

*Thomson v. Cont'l Ins. Co.*, 66 Cal. 2d 738 (1967) ......................................................... 4

*Trujillo v. Tony Avis Hay Service,* 2023 WL 4979853 (N.D. Cal. Aug 3, 2023) .......................... 5

*Turner v. HJB Express Freight, Inc.*, 2018 WL 3151680 (M.D. Fla. Apr. 20, 2018) ....................... 13

**Statutes**

18 U.S.C. § 2710 .......................................................................................................... 6

2016 Mich. Pub. Acts No. 92 .......................................................................................... 7

Mich. Comp. Laws § 445.1712 ........................................................................................ 7

**Other Authorities**

134 Cong. Rec. S5,396–08, S5,397–01 (May 10, 1988) (statements of Sen. Patrick Leahy) ................ 6

Chad Woodford, Comment, *Trusted Computing or Big Brother? Putting the Rights Back in Digital Rights Management*, 75 U. Colo. L. Rev. 253, 284 n.155 (2004) ........................................................ 7

S. Rep. No. 100-599, 2d Sess., at 5 (1988), ............................................................................................. 6

## I.    INTRODUCTION

Disappointed that they were not able to negotiate a settlement with Defendant and convinced, in error, that the Parties have reached an inadequate settlement, Proposed Intervenors repeat their unfounded allegations of collusion and reverse auction. They present no evidence of either collusion or reverse auction, because there was neither. As discussed in Plaintiff's Motion, the parties reached an excellent settlement for the Class, following arm's-length negotiations, informed by extensive investigation and sufficient discovery, between experienced counsel, and without Plaintiff's Counsel having any knowledge of the settlement discussions between Defendant and Proposed Intervenors.

Proposed Intervenors' claim that the settlement is inadequate is based on their mistaken belief that the recovery in this VPPA case, brought on behalf of a nationwide class for alleged violations dating back to no earlier than August 8, 2020, should be measured against recovery in settlements achieved on behalf of classes of Michigan consumers alleging violations of Michigan's Preservation of Personal Privacy Act ("PPPA") occurring prior to July 30, 2016.  In not one of the six Michigan PPPA actions relied upon by the Proposed Intervenors, was any amount recovered for the violation of that statute after July 31, 2016,[1] nor did any of the actions involve a nationwide class. Respectfully, this Court should reject Defendant's insistence that it compare apples to oranges. As explained in detail in Plaintiff's motion for preliminary approval, the proposed settlement in the instant case, when compared against nationwide VPPA class action settlements – the appropriate comparators – sits at the higher end of the range. *See* Pltf's Mot. for Prelim. App., Dkt. 26, 21:23-23:5.

Based on a misunderstanding of the applicable statute of limitations and the remedies available under the UCL, Proposed Intervenors also erroneously suggest that California residents have received preferential treatment. And, finally, Proposed Intervenors scrutinize the Settlement Agreement and proposed Notices, and come up with, at most, minor edits that the Parties can make quickly and which do not counsel against preliminary approval.

Stripped of its mudslinging and unfounded accusations, Proposed Intervenors' objection does not offer any substantive reason why the proposed Settlement should not be presented to the Class.

---

[1] That is because, as of July 31, 2016, the PPPA was amended to remove the $5,000 per incident statutory penalties provision and to allow a claim based only on actual damages.

1    Accordingly, Plaintiff requests that the Court preliminarily approve what is an excellent Settlement.

2    **II.     ARGUMENT**

3          **A.     Proposed Intervenors' Unfounded Allegations of Collusion and a Reverse Auction
                    Should be Disregarded**

4

5                *1.   Plaintiff's Counsel Are Experienced Class Action Attorneys*

6          Counsel do not wish to engage with Proposed Intervenors' mudslinging. As expressed in

7    Plaintiff's Opposition to Proposed Intervenors' Motion to Intervene, Counsel for Plaintiff are not

8    unsympathetic to the situation of the Proposed Intervenors who have spent considerable time

9    investigating and litigating claims which are encompassed by the proposed Settlement in the instant

10   case. However, repeated and unfounded allegations that Counsel for Plaintiff are "weak" and

11   "inexperienced" are unnecessary and inaccurate. Counsel for Plaintiff are highly experienced counsel,

12   with deep and extensive class action experience. HammondLaw has been approved as Class Counsel by

13   state and federal courts in over 100 cases in the past 12 years and has recovered in excess of $140 million

14   for consumers and employees during that period. Decl. of Julian Hammond in Support of Reply on

15   Motion for Prelim. Approval ("Hammond Reply Decl."), ¶ 8. Counsel for Plaintiff currently await a

16   final approval hearing in the Northern District of California on a privacy settlement valued at $23

17   million. *Id.* In a recent case, where Defendant refused to settle for what Counsel for Plaintiff believed

18   was an appropriate amount, Counsel took the case through trial and defended their successful judgment

19   on appeal. Decl. of Julian Hammond in Support of Motion for Preliminary Approval ("Hammond

20   Decl."), Dkt. 29, ¶ 50. Counsel for Plaintiff are, therefore, more than adequate counsel for Plaintiff and

21   the putative Settlement Class.

22                *2.   The Settlement is a Product of Well-Informed, Arms-Length Bargaining*

23         In contrast to Proposed Intervenors' lengthy description of their negotiations with Defendant,

24   Counsel for Plaintiff, mindful of the various privileges governing settlement communications, will not

25   offer a corresponding play-by-play description of offers and counteroffers in their own settlement

26   negotiations. However, it is appropriate to reiterate a point not challenged by Proposed Intervenors,

27   except by unsupported allegations: The excellent settlement achieved in the instant case was negotiated

28   by Counsel for Plaintiff at arm's-length and with no knowledge of the negotiations or the substance of

     any offers in proposed Plaintiff-Intervenors' case. *See* Hammond Decl., ¶¶ 20-23.

Proposed Intervenors suggest that Counsel for Plaintiff conducted no independent investigation and lacked sufficient information at the time the Settlement was negotiated. Opp. 7:12-14. To the contrary, as described in the Hammond Declaration, Counsel for Plaintiff engaged in extensive factual and legal research, investigation, and analysis of the Settlement Class's claims before filing Plaintiff's initial complaint. After initiating the instant case, Settlement Class Counsel continued to investigate in order to form a complete picture of the merits of the Settlement Class's claims, has obtained informal discovery from Defendant including information about the size of the Settlement Class, and through independent investigation has obtained information about the nature of Defendant's disclosure of customers' information to data brokers and other unauthorized third parties, and information about the configuration of the Meta Pixel on Defendant's websites during the relevant period. Hammond Decl. ¶¶ 14-19. Relatedly, there was no need for Plaintiff to insist on confirmatory discovery regarding class size when the Settlement Agreement contains an escalator clause. Settlement Agreement ("SA"), § 1.31.

Moreover, while Proposed Intervenors claim that they have "zealously litigated" the *Feller* action "to the point of informal and formal exchanges of discovery between the parties," Opp. 5:5-9, at the time that Proposed Intervenors were attempting to negotiate a settlement, they had essentially the same information as that known to Counsel for Plaintiff in the instant case. Decl. of J. Hammond Decl. in Support of Proposed Intervenors' Mot. to Intervene, Dkt. 35-1, ¶ 10. The fact that Proposed Intervenors went to mediation and attempted to negotiate a settlement without more indicates that they believed that information to be sufficient; Counsel for Plaintiff agrees. Proposed Intervenors also try to make something out of the fact that there is a $2.5 million insurance policy that potentially covers claims in this case. However, they fail to mention that the referenced policy is an eroding policy, which means that it is being depleted by defense costs. Decl. of Polina Brandler in Support of Reply on Motion for Prelim. ("Brandler Reply Decl.") ¶ 5. In any event, the settlement was reached without reference to insurance limits or Defendant's ability to pay. Thus, the existence of the insurance policy does not in any way show that the settlement amount is not fair and reasonable.

### 3. Defendant's Other Various Allegations are Simply Inaccurate

Distilled from among Proposed Intervenors' shrill accusations, there are a number of allegations that would potentially be material but for their inaccuracy. First, Proposed Intervenors are wrong to

suggest that the Settlement was intended to cover only the disclosures alleged in the First Amended Complaint. Opp. 8:3-17. The Settlement Agreement was deliberately crafted to address allegations in the "Action," defined as "*Jonathan Hoang To v. DirectToU, LLC,* originally filed in the Superior Court for the State of California as Case No. 24CV086809 and subsequently removed to the U.S. District Court for the Northern District of California as Case No. 3:24-cv-06447," rather than the allegations in a specific pleading. SA, §§ 1.1, 1.25. Thus, the Settlement Agreement contemplated the potential filing of a Second Amended Complaint which would add claims to conform the agreement between the Parties. Just such a Second Amended Complaint was subsequently filed pursuant to stipulation of the Parties.

Second, Proposed Intervenors suggest that the Parties filed a stipulation to remand the instant case to state court in order to "escape the first-to-file rule and the close scrutiny given to class action settlements by courts of this judicial district." Opp. 7, fn. 7. Not so. Had the instant case been remanded, Proposed Intervenors would still have been able to move to intervene and/or dismiss just as they have in the instant case. *See* Cal. Code of Civ. Proc. § 387. And, California applies the first-to-file rule in the same manner as federal courts. *See Thomson v. Cont'l Ins. Co.*, 66 Cal. 2d 738, 747 (1967) (discussing state courts' discretion to stay actions in favor of a "previously filed federal court suit on the same issues."). The Parties sought remand of the instant case for precisely the reason they gave in their stipulation: a concern that Article III standing might be an issue. Joint Stip. to Remand, Dkt. 18, 2:11-15. The Parties withdrew it after Proposed Intervenors made clear that they would create extra briefing for all concerned by opposing the stipulation. Not. of Withdrawal of Joint Stip. to Remand, Dkt. 32.

Third, Proposed Intervenors entirely misrepresent the substance of Counsel for Plaintiff's communications with Counsel for Proposed Intervenors on November 13, 2024. *See* Opp. at 10:12-11:10. Counsel for Plaintiff categorically did not offer to pay Counsel for Proposed Intervenors to withdraw their pending motion to intervene and to support the proposed Settlement. Instead, Counsel for Plaintiff made an entirely proper offer under which Counsel for Proposed Intervenors would dismiss the *Feller* Action and join the instant case as co-counsel. Hammond Reply Decl. ¶ 3; Brandler Reply Decl. ¶ 3. The purpose of the offer was to streamline the approval process, avoid unnecessary litigation that would waste resources and time, and to offer an opportunity to work together as a gesture of goodwill. Hammond Reply Decl. ¶ 4. It is irresponsible, then, for Counsel for Proposed Intervenors to

1    attempt to recast this offer as an effort to avoid scrutiny of the proposed Settlement. Opp., 11:1-6.

2        In addition to their numerous inaccurate factual claims, Proposed Intervenors also strongly imply

3    that arm's-length negotiations require a mediator. Opp. 10:2-3. This is incorrect. *See e.g. Trujillo v. Tony*

4    *Avis Hay Service,* 2023 WL 4979853, *4-5 (N.D. Cal. Aug 3, 2023) (approving PAGA settlement

5    reached through arms-length settlement negotiations, without the presence of a mediator); *Kuhr v. Mayo*

6    *Clinic Jacksonville,* 530 F.Supp.3d 1102, 1115 (M.D. Fla. 2021) (finding that the settlement was a

7    product of arm's-length negotiations because although negotiations did not involve a mediator there was

8    also no evidence in the record of fraud or collusion).

9        As a final matter, Plaintiff notes that Proposed Intervenors' opposition/objection to Plaintiff's

10    motion for preliminary approval, as initially filed, was substantially over-length at 33 pages. *See* Dkt.

11    38. It was supported by two declarations which were filed late. *See* Decl. of Frank S. Hedin, Dkt. 39

12    (filed on 11/19/24), Decl. of Tyler K. Somes, Dkt. 40 (filed on 11/19/24 (a day late)). Proposed

13    Intervenors subsequently filed a "corrected" opposition/objection and "corrected" versions of the two

14    late-filed declarations: each of these documents was filed late. *See* Dkts. 43-45 (all filed on 11/19/24 (a

15    day late)). The "corrected" opposition/objection remains over-length and would be more greatly over-

16    length but for a number of lengthy footnotes containing several substantive arguments. *See* Dkt. 43, fns.

17    5, 6, 7. Proposed Intervenors replies to the respective oppositions of Plaintiff and Defendant to Proposed

18    Intervenors' Motion to Intervene were also late. Dkt. 46-51 (all filed on 11/20/24 (a day late)). Plaintiff

19    considers it desirable for the Court to reach the merits of the two motions before it and, accordingly,

20    does not ask the Court to strike these numerous late-filed documents or any portion of Defendant's over-

21    length brief. However, these failings certainly undercut Proposed Intervenors' strident attempts to insult

22    the competence of Counsel for Plaintiff while promoting their own achievements and experience.

23        **B.    The Settlement is an Excellent Result for the Settlement Class**

24        Plaintiff has detailed the strengths and weaknesses of his three putative class claims, summarized

25    Defendant's various potential defenses, and explained the discounts applied to estimate Defendant's

26    realistic exposure. Mot. for Prelim. App., Dkt. 26, 14:2-20:20. Plaintiff has also described the value of

27    the relief recovered and has provided appropriate comparators in other VPPA cases which show that the

28    relief provided by the Settlement Agreement in the instant case is towards the high end of the range of

court-approved settlements in similar cases. *Id.* 21:16-23:5; Hammond Decl., Ex. 3 (Table of comparable VPPA cases). Put simply, the Settlement achieved, here, represents an excellent result.

In attempting to paint the Settlement as inadequate, Proposed Intervenors do not even acknowledge the risks posed by numerous potentially viable defenses available to Defendant, and discussed in Plaintiff's motion, including: (i) the risk that Plaintiff is compelled to individual arbitration; (ii) the risk that damages are limited to amounts paid by Class Members; (iii) the risk that Defendant may defeat class certification; and (v) the risk that the Court finds Plaintiff does not have Article III standing. Mot. for Prelim. App., Dkt. 26, 14:9-16:13. These risks are an important part of any serious analysis of both Defendant's realistic exposure and the adequacy of the relief offered by the Settlement.

Rather than engage with Plaintiff's detailed analysis, Proposed Intervenors focus on an inapposite comparison between the instant VPPA case and several cases brought under Michigan's PPPA for violations that occurred prior to July 31, 2016. To briefly provide some context, The VPPA was enacted by Congress on May 10, 1988, "after a newspaper 'published a profile of [Supreme Court nominee and then D.C. Circuit] Judge Robert H. Bork[,]' which contained the titles of 146 films he and his family had rented from a local video store." *Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251, 1252 (11th Cir. 2015) (quoting S. Rep. No. 100-599, 2d Sess., at 5 (1988), *as reprinted in* 1988 U.S.C.C.A.N. 4342); *see also Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 621 (7th Cir. 2014) (recounting the history of the VPPA). The VPPA was intended "to preserve personal privacy with respect to the rental, purchase, or delivery of video tapes or similar audio visual materials," as "[t]hese activities are at the core of any definition of personhood." 134 Cong. Rec. S5,396–08, S5,397–01 (May 10, 1988) (statements of Sen. Patrick Leahy).

"The Michigan legislature enacted the PPPA shortly after Congress enacted the federal Video Privacy Protection Act (VPPA), 18 U.S.C. § 2710." *Pratt v. KSE Sportsman Media, Inc.*, 586 F. Supp. 3d 666, 673 (E.D. Mich. 2022) (citing *Lin v. Crain Commc'ns Inc.*, 2020 WL 248445, at *2 (E.D. Mich. Jan. 16, 2020)). "Originally passed 'as a criminal statute without any private right of action,' the Michigan legislature amended the PPPA 'in 1989 to add a civil cause of action.' *Id.* (quoting *Boelter v. Advance Mag. Publishers Inc.*, 210 F. Supp. 3d 579, 586 (S.D.N.Y. 2016)). As recently as 2022, a District Court recognized that "[t]he PPPA 'lacks any significant litigation history.'" *Id.* (quoting

1  *Halaburda v. Bauer Publ'g Co.*, 2013 WL 4012827, at *2 (E.D. Mich. Aug. 6, 2013)). However, "[w]hat

2  can be said of the PPPA is that it 'provid[es] greater protections than the federal VPPA, including

3  protection of book purchase or borrowing records.'" *Id.* (quoting Chad Woodford, Comment, *Trusted*

4  *Computing or Big Brother? Putting the Rights Back in Digital Rights Management*, 75 U. Colo. L. Rev.

5  253, 284 n.155 (2004) (citing Mich. Comp. Laws § 445.1712)). Finally, while the original version of

6  the PPPA contained a $5,000-per-incident statutory damages provision, effective July 31, 2016, "the

7  Michigan legislature amended the PPPA to remove statutory damages, leaving only actual damages,

8  damages for emotional distress, and reasonable costs and attorney's fees." *Id.* (citing 2016 Mich. Pub.

9  Acts No. 92).

10        There are many state privacy statutes, of course, which bear some resemblance or relationship

11  to the VPPA. Proposed Intervenors do not explain why they believe the PPPA is particularly useful in

12  analyzing the adequacy of settlements under the VPPA; Counsel for Plaintiff suggest it is because

13  recoveries under the PPPA were particularly high on a per-class-member basis. Regardless, Proposed

14  Intervenors now seek to put Plaintiff in the strange position of justifying a recovery under the VPPA in

15  light of the purported potential recovery that might have been available under the PPPA had the

16  Settlement Class been Michigan only, had the alleged violations occurred prior to July 31, 2016, and

17  had the case been initiated within the 6-year statute of limitations applicable to the PPPA.

18        Proposed Intervenors' primary contention is that Plaintiff inappropriately discounted the

19  recovery available under the VPPA because of challenges unique to information disclosed via the Meta

20  Pixel. In doing so, Proposed Intervenors try to establish a rigid dichotomy between Pixel and non-Pixel

21  disclosures that is not supported by the facts of the instant case. There are several challenges inherent in

22  proving the disclosure of PII, within the meaning of the VPPA, via the Meta Pixel. But, there are similar

23  challenges inherent in proving the disclosure of PII by Defendant to data brokers. *See* Pltf's Mot. for

24  Prelim. App., 17:7-14; Hammond Decl. ¶ 34. Defendant's responses to Proposed Intervenors'

25  interrogatories in the *Feller* case illustrate some of these challenges. Defendant repeatedly indicate that

26  it "does not have any records which would allow Defendant to determine whether [data brokers]

27  accessed any data which would allow them to identify that a specific person bought a specific video

28  title." *See, e.g.,* Defendant DirectToU, LLC's Responses to [*Feller*] Plaintiffs' First Set of

Interrogatories, Dkt. 44-5, Responses to Interrogatories No. 4, 8, & 9. Thus, while Plaintiff believes it is true that PII was shared both with Meta, through the Meta Pixel, and with data brokers, through Defendant's "relationships with Data Axle, Wiland, Epsilon, and Path2Response" for both methods of disclosure there are challenges associated with proving what data was shared and about whom. Indeed, with Proposed Intervenors purporting to have investigated Defendant's alleged disclosures of information starting in August 2019, it is notable that Proposed Intervenors only initiated the *Feller* case after Counsel had begun, in 2022, "researching and investigating online tracking technologies, including the Meta Pixel technology, installed on consumer-facing websites across the Internet, including Defendant's websites, and counsel retained and consulted with an expert to assist with this work." Opp., 3:12-4:3. If proof of disclosure of PII to data brokerages were so devoid of the challenge facing plaintiffs pursuing class claims based on disclosures through the Meta Pixel and other tracking tools, why not file in the intervening three years. It is also noteworthy that the "data card" which Proposed Intervenors attached to their complaint in the *Feller* Action and which they claim "shows that all [individuals who purchased video products from any of Defendants' websites]'s purchase-related information was disclosed to data appenders, as well as to data cooperatives and renters and exchangers of this data," does no such thing. *See* Opp. 25:8-11; [Ex. A to *Feller* Complaint]. In fact, it does not indicate that any information regarding any viewing of any specific video, rather than "video categories," was available, and, to the extent that information was available it does nothing to show whether any such information was actually accessed or by whom. *See* [Ex. A to *Feller* Complaint]. Again, Proposed Intervenors' attempt to set up a dichotomy of pixel and non-pixel VPPA cases is fatally undercut by actual facts.

As set out in Plaintiff's motion, the applicable standard is whether the Settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). It is no relevant whether it is conceivable, as Proposed Intervenors suggest, a higher settlement could have been had. Moreover, it is simply not the case that Counsel for Plaintiff, in reaching a settlement, failed to appreciate that Defendant's alleged disclosures of customer information were not solely via the Meta Pixel. By any reasonable measure, the Settlement actually achieved is more than fair, reasonable, and adequate.

## C.    The Proposed Settlement Does Not Give Preferential Treatment to California Residents

1
2
3
4
5
6

There is no basis to Proposed Intervenors' suggestion that the Settlement gives preferential treatment to California residents. Indeed, had that been the intention, the Settlement could have allocated more than a simple *pro rata* share to California residents on the basis that the Second Amended Complaint contains one nationwide cause of action and two causes of action unique to California. To the contrary, the Settlement Agreement does not provide for any greater recovery by members of the California subclass than by members of the nationwide Settlement Class.

7
8
9
10
11
12
13

The Settlement Class includes residents of the United States about whom information identifying them "as having requested or obtained specific video materials or services from Defendant may have been disclosed to a third party **between August 8, 2022, and the date of Preliminary Approval**." SA, § 1.30 (emphasis added). The inclusion in the Settlement Class of California residents about whom information identifying them "as having requested or obtained specific video materials or services from Defendant may have been disclosed to a third party between **August 8, 2020**, and the date of Preliminary Approval," SA, § 1.30 (emphasis added), is explained by the four-year statute of limitations of the UCL.

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Relying on *Guzman v. Polaris Industries*, Proposed Intervenors mistakenly suggest that the statute of limitations on the UCL claim is necessarily only of the same duration as the two-year limitation period applicable to the VPPA claim – the "longest limitation period applicable to the underlying predicate claim." Opp. 22:3-11 (citing 49 F. 4th 1308, 1312 (9th Cir. 2022)). And, thus, there is no basis for including, in the Settlement Class, California Residents whose claims run from four years prior to the commencement of the instant case. In fact, in *Guzman*, the Ninth Circuit said nothing about the appropriate statute of limitations under the UCL. Rather it held that, in the case before it, a plaintiff "could not bring his equitable UCL claim in federal court because he had an adequate legal remedy in his time-barred CLRA claim." 49 F. 4th, at 1311. Thus, applied to the instant case, *Guzman* stands for the proposition that, if Plaintiff could not pursue equitable relief under the UCL during the period covered by the VPPA's statute of limitations (because he had an adequate remedy at law under the VPPA), he cannot pursue equitable relief prior to the VPPA's statutory period even though relief under the VPPA is time-barred. But, the operative Second Amended Complaint alleges that "Plaintiff lacks an adequate remedy at law," and that "due to the ongoing [ ] nature of the harm, the harm cannot be adequately addressed by monetary damages alone." Dkt 23, ¶ 105. Thus, at this stage, it cannot be said

1   that the VPPA offers an adequate remedy at law. *See In re Natera Prenatal Testing Litig.*, 664 F. Supp.

2   3d 995, 1012-13 (N.D. Cal. 2023). And, the Parties have agreed to settle Plaintiff's UCL claim;

3   Defendant is not seeking to challenge Plaintiff's ability to pursue that claim. Accordingly, Proposed

4   Intervenors are wrong to suggest the UCL claim is subject to a two-year limitations period.

5          Finally, Proposed Intervenors suggest that the UCL only provides for injunctive relief. This is

6   plainly wrong. The remedies available under the UCL are injunctive relief **and restitution**. *See Roffman*

7   *v. Rebbl, Inc.*, 653 F. Supp. 3d 723, 731 (N.D. Cal. 2023) ("It is well-established that claims for relief

8   under the . . . UCL are limited to restitution and injunctive relief." (citing *Korea Supply Co. v. Lockheed*

9   *Martin*, 29 Cal. 4th 1134, 1146-49 (2003))). Accordingly, it is entirely proper for Plaintiff to seek, in his

10  Second Amended Complaint, "[a]n order restoring to Plaintiff and other Class Members any money and

11  property acquired by Defendant through tis wrongful conduct." Second Amend. Comp., Dkt. 23, Prayer

12  for Relief, ¶ 113. And, monetary payments categorically **would be available** to California residents

13  "whose claims accrued more than two years prior to the commencement of this case." Opp. 22:9-11.

14         Thus, in sum, the proposed definition of the Settlement Class does not inappropriately favor

15  California residents, rather, it merely appropriately accounts for the existence of a UCL cause of action

16  applicable only to California residents.

17         **D.     The Settlement is Not Deficient**

18         The Settlement Agreement is well-crafted and meets the requirements for preliminary approval.

19  Proposed Intervenors have identified a handful of aspects of the Settlement which they contend are

20  deficient. Plaintiff disagrees but, to the extent the Court finds that revisions to the Settlement or Proposed

21  Class Notices are necessary, the Parties will be prepared to meet and confer expeditiously and address

22  the Court's concerns.

23              **4.    *Proposed Intervenors' Objection to the Definitions of Released Claims and
                        Released Parties is Unfounded***

24

25         The claims released by the Settlement Agreement are those based on the same conduct regarding

26  the sharing of personally identifiable information relating to video materials or services that underlies

27  the claims pled in the Second Amended Complaint, although not limited to the claims actually pled.

28  Plaintiff believes this difference is appropriate given the Parties desire to resolve all issues relating to

    Defendant's alleged disclosure of personally identifiable information within the meaning of the VPPA.

1        Much of Proposed Intervenors' argument regarding the scope of the release clauses in the

2    Settlement Agreement focuses on a comparison with the allegations contained in the First Amended

3    Complaint. However, the definition of the "Released Claims" in the Settlement Agreement refers to "the

4    Action," defined as "*Jonathan Hoang To v. DirectToU,* LLC, originally filed in the Superior Court for

5    the State of California as Case No. 24CV086809 and subsequently removed to the U.S. District Court

6    for the Northern District of California as Case No. 3:24-cv-06447," rather than a specific pleading. SA,

7    §§ 1.1, 1.25. The Parties stipulated to the filing of the Second Amended Complaint which added claims

8    to confirm to the Settlement Agreement between the parties. Thus, Proposed Intervenors are not correct

9    that "the release provisions of the Proposed Settlement must be 'limited to claims based on the identical

10   factual predicate' as the claims alleged in the First Amended Class Action Complaint." Opp. 12:17-20.

11   Instead, it is the claims and allegations of the Second Amended Complaint which control the appropriate

12   scope of the release clause.

13       The Settlement Agreement defines "Released Claims" to include those relating to or arising out

14   of "the collection of information and/or the sharing of information with third parties which identifies a

15   person as having requested or obtained specific video materials or services . . . ." SA, § 1.25. This

16   matches the allegations of the Second Amended Complaint. Proposed Intervenors selectively quote the

17   proposed Class Notice and then suggest that this simplified language somehow is a better indication of

18   the released claims than the Settlement Agreement's definition of "Released Claims." Opp. 13:23-14:6.

19   To be clear, the full quote in the Class Notice reads: "In addition, as more fully described in the

20   Settlement Agreement, your claims against Defendant and the Released Parties relating to the alleged

21   collection and/or disclosure of your information by or to third parties will be released." Dkt. 26-2, pp.

22   40-41. This is a reasonable attempt to apprise Class Members of the types of claims they are releasing,

23   in relatively simple language, while indicating that a more complete description is available in the

24   Settlement Agreement: Nothing more. It is not intended to indicate that claims relating to sharing of

25   information <u>by</u> third parties are being released. Should the Court find that revisions are required to the

26   proposed Class Notice, the Parties will promptly make any required changes.

27       Proposed Intervenors also object that the definition of "Released Claims" includes claims that

28   are "un-accrued." Opp. 14:7-15.  Proposed Intervenors misunderstand this term to refer to cover claims

arising from future conduct. No so. Rather, "unaccrued" claims that are tied a specific incident(s) and limited to claims – as here - that are those that "were alleged or brought or could have been alleged or brought in the Action," refer to claims that are "legally unaccrued" but are based on past, not future, conduct. Such releases are permissible. *See e.g. G.F. v. Contra Costa County,* 2015 WL 7571789, at *4 (N.D. Cal. Nov. 25, 2015) (granting final approval in a class action settlement with a release provision that released "any and all claims, . . . accrued or unaccrued, . . . that have been brought in the Lawsuit or which could have been brought . . . arising [during the class period]"). *See also Noell Crane Systems GmbH v. Noell Crane and Service, Inc.,* 677 F. Supp. 2d 852, 869-870 (E.D. Va. Dec. 21, 2009) (distinguishing between unaccrued claims based on past conduct in the release before the court and with "post-release claims [that] arose out of post-release conduct").

Proposed Intervenors further object to the Settlement Agreement's release provisions on the ground that they are overbroad because they refer not just to the transmission of PII to Meta and the disclosure of PII to data aggregators and brokers but also to claims arising from or relating to the "collection of information." Opp. 15:4-16. Proposed Intervenors assert that the collection of information is not a factual predicate on which the claims alleged in the Second Amended Complaint arise. *Id.* To the contrary, the collection of information is the subject of several allegations in the Second Amended Complaint. *See, e.g.,* Second Amended Complaint, Dkt. 23, ¶¶ 23, 28, 30, 32, 58 ("Plaintiff discovered that Defendant's website surreptitiously **collected** and transmitted his [PII] in or about April 2024 and also that the website has **collected** and offered for rent and/or sale his [PII]." (emphasis added)), 65, 67 (". . . Defendant was and continues to be under a duty to disclose the nature, significance, and consequences of its **collection** and treatment of website visitors' and customers' PII." (emphasis added)), 75(f), 105. Accordingly, the release of claims relating to the collection of information is entirely in keeping with the "factual predicate" of the operative pleading.

Finally, Proposed Intervenors argue that the definition of "Released Parties" is too broad. But the inclusion of defined entities, including non-parties, that are not identified by name is standard practice. The unpublished out-of-circuit decision cited by Proposed Intervenors does not require a different result and, regardless, is distinguishable because it sought to release "*future* affiliates, predecessors, heirs, . . . subsidiaries, assigns, insurers, payroll companies . . . ." *Turner v. HJB Express*

1   *Freight, Inc.*, 2018 WL 3151680, at *3 (M.D. Fla. Apr. 20, 2018) (emphasis added in original).

2   Furthermore, the two release provisions work together so that is it the Released Claims that are being

3   Released against Released Parties. It is not the case that any general release is being granted to Released

4   Parties. Accordingly, contrary to Proposed Intervenors claim, there is no prospect that "third parties

5   totally unaffiliated with Defendant and having played no role in the facts giving rise to the claims alleged

6   in . . . the SAC" will be somehow "released."

7                    **5.  *The Use of a Claim Form is Intended to Benefit the Class***

8            As explained in Plaintiff's motion for preliminary approval, the use of a claim form, which

9   allows for the selection of electronic methods of receiving payment, makes it more likely that a greater

10  proportion of the settlement funds distributed will actually be received and redeemed by Class Members

11  (reducing the amount sent to the *cy pres* recipient), will reduce the likelihood of fraud in the receipt of

12  settlement funds, and will reduce the costs of administration because payments by electronic means are

13  significantly less expensive than printing and mailing checks. Dkt. 26, 28:11-20. Put simply, the Parties'

14  intention in requiring the use of a claim form is to increase the total sum of money ultimately paid to

15  Settlement Class Members. Given that this is non-reversionary settlement, SA (Dkt. 26-2), § 1.31(a),

16  there is no prospect of any of the Settlement Fund reverting to Defendant. The sole interest of the Parties'

17  is in ensuring the greatest amount of money reaches Settlement Class Members; they believe that the

18  use of a Claim Form will help to achieve this goal. *See e.g., Keller v. Nat'l Collegiate Athletic*

19  *Association (NCAA)*, No. 4:09-CV-1967 CW, 2015 WL 5005901, at *5 (N.D. Cal., Aug. 19, 2015)

20  (overruling objections to the use of a claims process based on finding that the process, *inter alia*,

21  "minimizes waste, fraud, and administrative costs").

22                    **6.  *The Proposed Class Notices Are More than Adequate***

23           Proposed Intervenors suggest that the proposed Class Notice to be provided on the Settlement

24  Website, Ex. C to the Settlement Agreement, is inaccurate because it sets out a range for recovery by

25  Settlement Class Members submitting a claim form that is lower than the actual expected recovery for

26  each such Settlement Class Member. The range contained in the proposed Settlement Website Class

27  Notice ($35 to $65) equates to a claims rate of roughly 10% to 6%. In fact, applying a 5% claims rate –

28  the rate estimated by the Settlement Administrator and Counsel for Plaintiff – the expected recovery is

$80. Rather than constituting an objectionable inaccuracy, the discrepancy merely reflects the Parties' desire not to promise more to Settlement Class Members than will be delivered.[2]

Proposed Intervenors also object that the Direct Class Notice, to be sent via email, and as a reminder notice, does not state a range for recovery by Settlement Class Members submitting a claim form. *See* SA, Ex. B. Of course, a shorter form email notice, necessarily, cannot fit all pertinent information. Nevertheless, should the Court deem it desirable, the Parties will add the estimated range of recovery of $35 to $65 to the Direct Class Notice.

With respect to the Settlement Website, Notice provided on that website will be "substantially in the form of Exhibit C" to the Settlement Agreement. *See* SA, § 4.1(e), Ex. C. It is not practicable and not required for the proposed Settlement Administrator, yet to be approved by the Court, or the parties, prior to preliminary approval to secure and pay for a specific URL for the settlement website or to incur the cost of developing that website. Proposed Intervenors suggestion to the contrary is not supported by any authority or by the Northern District's Guidelines. Moreover, Proposed Intervenors' argument about a specific web address that is accessible through the [WEB ADDRESS] placeholder in the Direct Class Notice is purely a red herring. That specific web address will not be used as the Settlement Website in the instant case. Proposed Intervenors' desperate attempts to manufacture issues where there are none should be given short shrift by the Court.

### 7. The Settlement Administrator Was Selected as Part of an Adequate and Appropriate Competitive Bidding Process

Counsel for Plaintiff complied with the Northern District of California's Procedural Guidance for Class Action Settlements when they described the competitive process by which Angeion Group, LLC, was selected as the proposed Settlement Administrator. As set out in the Declaration of Julian Hammond, Counsel for Plaintiff solicited bids from two well-known settlement administrators, who each proposed "generally similar notice and claims process to the one the parties ultimately selected." Hammond Decl., Dkt. 29, ¶ 64. The Proposed Intervenors complain that Counsel for Plaintiff did not "explain why only two proposals for the administration work were obtained," did not "identify the other company besides Angeion that submitted a proposal" and did not "provide the assumptions used by each

---

[2] The inclusion of a reference to a "voucher" in the draft Long-Form Notice is an error that will be corrected before Notice is sent out to the Class.

company to prepare estimates." Opp., 19:13-20. But, these purported "requirements" are not found in the Northern District's Procedural Guidance. Rather, they are the creations of Proposed Intervenors. Nevertheless, to the extent such information would aid the Court, Counsel for Plaintiff are happy to disclose that: the second bid they received was from Kroll, LLC; they obtained only two bids because, based on their considerable experience of class action settlements, they judged both bids to be highly-competitive, and believed obtaining a third bid was unnecessary; and the assumptions upon which both bids were based were the same as, or substantially similar to, those used by Angeion to generate the bid that was ultimately accepted and which forms the basis for the Notice and Administration Plan presented to the Court. Hammond Reply Decl., ¶ 9. Proposed Intervenors' other point has more merit. Counsel for Plaintiff have corrected their failure to disclose their "history of engagements" Angeion over the past two years. As set out in the Hammond Reply Declaration at ¶ 10, Counsel for Plaintiff have not used Angeion during the past two years; although Angeion was considered strongly for the role of settlement administrator in *Smith-Washington v. TaxAct,* Case No. 3:23-cv-000830 (N.D. Cal.).

Proposed Intervenors' objection regarding the settlement administration quote makes little sense given Angeion's representation (Dkt. 26-8) that the total expense will be less than $125,000. Opp. 19:21-20:8. In any event, Proposed Intervenors offer no authority for the proposition that a "not-to-exceed" quote is required. And the notion that not obtaining a "not-to-exceed" quote "all but invit[es]" cost overruns is insulting to the well-respected Settlement Administrator. Moreover, the Settlement Agreement only provides for the payment of Settlement Administrator Expenses "up to one hundred twenty five thousand dollars ($125,000.00)," SA, § 1.28, and, pursuant to the Northern District's Procedural Guidance for Class Action Settlements, "[t]he court may not approve the amount of the cost award to the Settlement Administrator until the final approval hearing," N.D. Cal. Proc. Guidance for Class Action Settlements, Preliminary Approval, ¶ 2. Proposed Intervenors' suggestion, then, that administrative costs might "balloon" and that there is no protection for the interests of Settlement Class Members is another red herring.

## III.    CONCLUSION

For the foregoing reasons, and the reasons set out in Plaintiff's motion for preliminary approval, Plaintiff respectfully requests that the Court preliminarily approve the proposed Settlement.

DATED:   November 25, 2024                              Respectfully submitted,


                                                        /s/ Julian Hammond
                                                        _____
                                                        Julian Hammond
                                                        *Attorneys for Plaintiff and Proposed Class*
                                                        *Counsel*