1    JULIAN HAMMOND (SBN 268489)
     jhammond@hammondlawpc.com
2    POLINA BRANDLER (SBN 269086)
     pbrandler@hammondlawpc.com
3    ARI CHERNIAK (SBN 290071)
     acherniak@hammondlawpc.com
4    HAMMONDLAW, P.C.
     1201 Pacific Ave, 6th Floor
5    Tacoma, WA 98402
     (310) 601-6766 (Office)
6    (310) 295-2385 (Fax)
7
8    FRANK S. HEDIN (SBN 291289)
     fhedin@hedinllp.com
9    HEDIN LLP
     1395 Brickell Ave, Suite 610
10   Miami, Florida 33131
     (305) 357-2107 (Office)
11   (305) 200-8801 (Fax)
12
     *Attorneys for Plaintiffs and the Putative Class*
13

14                    **UNITED STATES DISTRICT COURT**

15                   **NORTHERN DISTRICT OF CALIFORNIA**

16

17   **JONATHAN HOANG TO; JEFFRY HEISE;**          Case No 3:24-CV-06447-WHO
     **and JOSEPH MULL,** individually and on
18   behalf of all others similarly situated,

19                                                  **THIRD AMENDED CLASS ACTION**
                                                    **COMPLAINT FOR:**
20                    Plaintiffs,

21   v.                                             **(1) Violation of the Video Privacy**
                                                    **Protection Act (18 U.S.C. § 2710);**
22   **DIRECTTOU, LLC; and ALLIANCE**              **(2) Violation of Cal. Civ. Code § 1799.3;**
     **ENTERTAINMENT, LLC,** Delaware Limited       **and**
23   Liability Companies,                           **(3) Violation of Business & Professional**
                                                    **Code §§ 17200 et seq. (UCL)**
24                    Defendants.

25                                                  **JURY TRIAL DEMANDED**

26

27

28

Jonathan Hoang To ("Plaintiff Hoang To"), Jeffry Heise ("Plaintiff Heise"), and Joseph Mull ("Plaintiff Mull") (collectively, "Plaintiffs") allege the following based upon personal knowledge, or, where applicable, information, belief, and the investigation of counsel:

## **NATURE OF THE ACTION**

1.      This is a privacy class action lawsuit, pursuant to Federal Rule of Civil Procedure 23, against Defendants DirectToU, LLC ("DirectToU") and Alliance Entertainment, LLC ("Alliance") seeking statutory damages, civil penalties, restitution, disgorgement of profits, declaratory relief, public injunctive relief, and reasonable attorney's fees and costs pursuant to the Video Privacy Protection Act, 18 U.S.C. § 2710 (the "VPPA"), Cal. Civ. Code § 1799.3, and Cal. Business & Professions Code §§ 17200 ("UCL").

2.      Defendants collectively develop, own and operate several websites - www.deepdiscount.com, ccvideo.com, and moviesunlimited.com that sell DVD and Blu-ray videos and/or videogames to customers in the U.S. The websites together feature several hundred thousand prerecorded DVD and Blu-ray videos and videogames. On their websites, Defendants also offer customers the option to sign up to receive notices, including exclusive offers and pre-order opportunities, about videos or videogames.

3.      Despite their clear legal obligations under federal and California law, Defendants knowingly and intentionally disclosed, throughout the time period relevant to this action, their customers' personally identifiable information— including personal identifiers and a record of every DVD or Blu-ray video or videogame they purchased and/or requested ("Personally Identifiable Information" or "PII")—to a third party, Meta Platforms Inc. (formerly known as Facebook) ("Meta" or "Facebook") through the use of the Meta Pixel, without their customers' consent or knowledge. In addition, Defendants systematically disclosed, throughout the time period relevant to this action, all of their customers' Personally Identifiable Information to third parties other than Meta, including data aggregators, data brokers, data appenders, and data cooperatives – including Data Axle, Inc., Wiland, Inc., Epsilon Data Management, LLC, and Path2Response, LLC – as well as other third-party renters and exchangers of their customers' Personally Identifiable Information, also without their customers' consent or knowledge. Defendants' disclosures of their customers' information to

these numerous third parties remained ongoing as of the date this action was commenced.

4.     Federal law recognizes, through the VPPA, that our video-viewing habits are intimately private. The law accordingly requires companies that sell, rent, or offer subscriptions to prerecorded video materials to maintain their customers' privacy and prohibits, among other things, the knowing disclosure of customers' video material choices to any third party without the customers' specific advance written consent.

5.     The California Constitution similarly recognizes that all people are by nature entitled to a right to privacy.[1] Cal. Civ. Code § 1799.3 accordingly prohibits video sellers or renters from disclosing "any personal information or the contents of any record, including sales or rental information, which is prepared or maintained by that person, to any person, other than the individual who is subject of the record, without the written consent of that individual."[2]

## PARTIES

6.     Plaintiff Huang To is, and has been at all relevant times, a resident of Los Angeles, California. On or about May 15, 2023, Plaintiff Hoang To purchased three videos from Defendants at www.deepdiscount.com. Throughout the time that Plaintiff Hoang To purchased prerecorded video material on Defendants' website, he has had a Facebook account.

7.     Plaintiff Heise is, and has been at all relevant times, a resident of Coldwater, Michigan. On or about April 4, 2023, Plaintiff Heise purchased one or more videos from Defendants at www.ccvideo.com. Throughout the time that Plaintiff Heise purchased prerecorded video material on Defendants' website, he has had a Facebook account.

8.     Plaintiff Mull is, and has been at all relevant times, a resident of Arenzville, Illinois. On or about July 11, 2024, Plaintiff Mull purchased one or more videos from Defendants at www.moviesunlimited.com. Throughout the time that Plaintiff Mull purchased prerecorded video material on Defendants' website, he has had a Facebook account.

---

[1] Ca. Const., art. I, § 1.
[2] *See* Cal. Civ. Code § 1799.3(a).

9.      Defendant DirectToU, LLC is a Delaware Limited Liability Company, based in Plantation, Florida.

10.     Defendant Alliance Entertainment, LLC is a Delaware Limited Liability Company, based in Plantation, Florida.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 over the claims that arise under the Video Privacy Protection Act, 18 U.S.C. § 2710.

12.     This Court also has jurisdiction under 28 U.S.C. § 1332(d) because this action is a class action in which the aggregate amount in controversy for the proposed Class and California Sub-class (defined below) exceeds $5,000,000, and at least one member of the Class is a citizen of a state different from that of each of the Defendants.

13.     This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 as these claims are part of the same case or controversy as the federal statutory claim over which the Court has original jurisdiction.

14.     This Court has personal jurisdiction over the parties because Defendants have continuously and systematically conducted business in the State of California, and Defendants direct substantial business activity, including the shipping of DVD's and Blu-rays, into California. Additionally, Plaintiff Hoang To is a California resident whose rights were violated in the State of California as a result of his contact with Defendants from and within California.

15.     Venue is proper in the United States District Court for the Northern District of California pursuant to 28 U.S.C. §§ 1391, 1441 and 1446.

# FACTUAL BACKGROUND

## I.  Defendants Provide Video Tape Services to Plaintiffs and Their Other Customers.

16.    Defendants operate DVD and/or Blu-ray sales websites (www.deepdiscount.com, www.ccvideo.com, and www.moviesunlimited.com), on which consumers can purchase prerecorded videos and videogames on DVD and Blu-ray formats.[3]

17.    Defendants' websites offer hundreds of thousands of pre-recorded videos and video games for sale.

18.    Defendants' websites also encourage and permit consumers to sign up for notices about videos and videogames, including notices of special offers and pre-order opportunities.

19.    Once a customer purchases a videogame or a DVD or Blu-ray video, Defendants ship the purchased video game, DVD, or Blu-ray video to the customer.[4]

20.    Thus, Defendants are "video tape service providers" within the meaning of 18 U.S.C. § 2710(a)(4) because they are engaged in the business of "rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials."

21.    And, Plaintiffs and Defendants' other customers are "consumers" within the meaning of 18 U.S.C. § 2710(a)(1) because they are "renter[s], purchaser[s], or subscriber[s] of goods or services from a video tape service provider."

22.    Plaintiffs and Defendants' other customers are "purchasers" of goods or services from video tape service providers because they purchased videos from Defendants in the form of DVDs and Blu-ray videos and videogames.

23.    Defendants are also "person[s] providing video recording sales or rental services" within the meaning of Cal. Civ. Code § 1799.3(a), because they are engaged in the business of "providing video recording sales or rental services."

---

[3] *See* https://www.deepdiscount.com/movies (last visited on October 31, 2024); https://www.ccvideo.com/ (last visited October 31, 2024); https://www.deepdiscount.com/ (last visited on October 31, 2024)

[4] *See e.g.,* https://www.deepdiscount.com/checkout (last visited October 31, 2024).

24.     And, Plaintiffs and Defendants' other customers are each a "person who is the subject of the records" under Cal. Civ. Code § 1799.3(c).

## II.    Defendants Have Maintained a Meta Pixel on Their Websites Throughout the Class Period

25.     On information and belief, Defendants first implemented the Meta Pixel on their websites beginning in or about November 2016 and continued to maintain the Meta Pixel on their websites until approximately the end of October 2024.

26.     According to the FTC: "Pixel tracking can be monetized in several ways. One way to monetize pixel tracking is for companies to use the tracking data collected to improve the company's own marketing campaigns. The data can be used to target more specific audiences with ads and other marketing messages. Another is that companies can monetize the data collected by further optimizing their own ad targeting systems and charging other companies to use its advertising offerings."[5]

27.     Meta, which operates Facebook and was called Facebook, Inc. until changing its name in January 2022, is the world's largest social media company. Meta reported having 2.04 billion daily active users as of March 2023,[6] and reported $116.61 billion in revenue in fiscal year 2022.[7]

28.     Meta's current revenue, as well as its revenue when the company was called Facebook, Inc., has been derived almost entirely from selling targeted advertising to Facebook users, users of its family of apps including Instagram, and internet users on non-Facebook sites that integrate Meta marketing source code on their websites. Meta reported in Fiscal Year 2022 that its revenue from advertising was over $113 billion and Meta stated that it "generated substantially all of our

---

[5] *See* https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/03/lurking-beneath-surface-hidden-impacts-pixel-tracking (citing M. Eddy. "How Companies Turn Your Data Into Money." PC Mag. October 10, 2018. https://www.pcmag.com/news/how-companies-turn-your-data-into-money) (last visited Oct. 28, 2024.)

[6] Meta Reports First Quarter 2023 Results, https://s21.q4cdn.com/399680738/files/doc_news/Meta-Reports-First-Quarter-2023-Results-2023.pdf

[7] Meta Reports Fourth Quarter and Full Year 2022 Results, 2/1/23, https://s21.q4cdn.com/399680738/files/doc_financials/2022/q4/Meta-12.31.2022-Exhibit-99.1-FINAL.pdf (last visited Oct. 28, 2024).

revenue from selling advertising placements on our family of apps to marketers."[8] In its 10k filing covering the fiscal year 2018, Facebook similarly admitted that, "We generate substantially all of our revenue from selling advertising placements to marketers."[9]

29.    Facebook describes itself as a "real identity platform,"[10] meaning users are allowed only one account and must share "the name they go by in everyday life."[11]   Therefore, when users create an account, they must provide their first and last name, along with their birthday and gender.[12]

30.    Facebook sells advertising space by highlighting its ability to target users.[13] Facebook can target users so effectively because it surveils user activity both on and off its site.[14] This allows Facebook to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "Connections".[15] Facebook complies this information into a generalized dataset called "Core Audiences", which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[16]

31.    Advertisers can also build "Custom Audiences."[17] Custom Audiences enable advertisers to reach "people who have already shown interest in [their] business, whether they're

---

[8] Meta, SEC 10k filing for the Fiscal Year Ending Dec. 31, 2022, https://www.sec.gov/Archives/edgar/data/1326801/000132680123000013/meta-20221231.htm (last visited Oct. 28, 2024).

[9] Facebook, SEC 10k filing for the Fiscal Year Ending Dec. 31, 2018. https://www.sec.gov/Archives/edgar/data/1326801/000132680119000009/fb-12312018x10k.htm.

[10] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).

[11] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.

[12] FACEBOOK, SIGN-UP, http://www.facebook.com/

[13] FACEBOOK, WHY ADVERTISE ON FACEBOOK, https://www.facebook.com/business/help/205029060038706.

[14] FACEBOOK, ABOUT FACEBOOK PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

[15] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

[16] FACEBOOK, EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK, https://www.facebook.com/business/news/Core-Audiences.

[17] FACEBOOK, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227?id=2469097953376494

loyal customers or people who have visited [their] website."[18] Advertisers can use a Custom Audience to target existing customers directly, or they can use it to build a "Lookalike Audiences," which "leverages information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[19] Unlike Core Audiences, Custom Audiences require an advertiser to supply the underlying data to Facebook. They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Facebook's "Business Tools," which collect and transmit the data automatically.[20] One such Business Tool is the Meta Tracking Pixel.

32.    The Meta Tracking Pixel is a piece of code that advertisers, like Defendants, can integrate into their websites.  Once activated, the Meta Tracking Pixel "tracks the people and type of actions they take."[21] When the Meta Pixel captures an action, it sends a record to Facebook.  Once this record is received, Facebook processes it, analyzes it, and assimilates it into datasets like the Core Audiences and Custom Audiences.

33.    Advertisers control what actions—or, as Facebook calls it, "events"—the Meta Tracking Pixel will collect along with what pages a visitor views and what buttons a visitor clicks.[22] Advertisers can also configure the Meta Tracking Pixel to track other events.  Meta offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or purchases.[23]

---

[18] FACEBOOK, ABOUT EVENTS CUSTOM AUDIENCE,
https://www.facebook.com/business/help/366151833804507?id=300360584271273.
[19] FACEBOOK, ABOUT LOOKALIKE AUDIENCES,
https://www.facebook.com/business/help/164749007013531?id=401668390442328.
[20] FACEBOOK, CREATE A CUSTOMER LIST CUSTOM AUDIENCE,
https://www.facebook.com/business/help/170456843145568?id=2469097953376494.
[21] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.
[22] *See* FACEBOOK, FACEBOOK PIXEL, ACCURATE EVENT TRACKING, ADVANCED,
https://developers.facebook.com/docs/facebook-pixel/advanced/; *see also* FACEBOOK, BEST
PRACTICES FOR FACEBOOK PIXEL SETUP,
https://www.facebook.com/business/help/218844828315224?id=1205376682832142.
[23] FACEBOOK, SPECIFICATIONS FOR FACEBOOK PIXEL STANDARD EVENTS,
https://www.facebook.com/business/help/402791146561655?id=1205376682832142.

34.    An advertiser can also create their own tracking parameters by building a "custom event."[24]

35.    Advertisers control how the Meta Tracking Pixel identifies visitors. The Meta Tracking Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific Data."[25] Http Headers collect "IP Addresses, information about web browser, page location, document, [referrer] and persons using the website."[26] Pixel-specific Data includes "the Pixel ID and cookie."[27]

36.    FTC Commissioner Rohit Chopra addressed the harms that can be caused by sharing information with Facebook when he stated in 2019, "Because behavioral advertising allows advertisers to use mass surveillance as a means to their undisclosed and potentially nefarious ends, Facebook users are exposed to propaganda, manipulation, discrimination, and other harms.  . . . Facebook's massive, private, and generally unsupervised network of advertisers has virtually free rein to microtarget its ads based on every aspect of a user's profile and activity. The company's detailed dossiers of private information includes things like a user's location and personal connections, but it also includes the history of everything a user has ever done wherever Facebook is embedded in the digital world."[28]

### III.    Defendants Knowingly and Intentionally Sent Plaintiffs' and Their Other Customers' Personally Identifiable Information (PII) to Meta

37.    As stated above, beginning in or about November 2016 and continuing through to approximately late 2024, Defendants have maintained the Meta Pixel on their websites and transmitted Plaintiffs' and their other customers' personal information or the contents of any record, including [their] sales or rental information," including "information which identifies a person as

---

[24] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142.
[25] FACEBOOK, FACEBOOK PIXEL, https://developers.facebook.com/docs/facebook-pixel/.
[26] See id.
[27] See id.
[28] See Dissenting Statement of FTC Commissioner Rohit Chopra, In re Facebook, Inc., Commission File No, 1823109, July 24, 2019. https://www.ftc.gov/system/files/documents/public_statements/1536911/chopra_dissenting_state ment on facebook_7-24-19.pdf.

having requested or obtained specific video materials or services", including their personal identifiers, without their consent, to Meta in accordance with the Meta Pixel's configuration.

38.    When Plaintiffs and Defendants' other customers visited one of Defendants' websites, the Meta Pixel automatically caused the Plaintiffs' and Defendants' other customers' personal identifiers, including IP addresses and the c_user, _fr, _and datr cookies, to be transmitted to Meta, attached to the fact that particular Plaintiffs/customers had visited the website and the titles of the webpages the Plaintiffs/Defendants' other customers viewed.

39.    The cookies that were transmitted as a result of the Meta Pixels that Defendants installed on their websites conveyed Plaintiffs' and their other customers' Facebook IDs (through the c_user cookie), which can be used by Facebook and any ordinary person to find the user's real name, the specific and unique web browser from which the customer is sending the communication, and an encrypted combination of the information contained in those two cookies (fr cookie).

40.    The Meta Tracking Pixel hosted on Defendants' websites transmit information associated with the Purchase event to Facebook, which is shown in Figure #1 below:[29]

_____

[29] This data derives from a tool created and offered by Facebook.

1

**Figure #1**

2

3



4

5

6

7

8

9

10

11

12

13

14

15          41.    The information associated with the Purchase event transmitted to Facebook,

16   permits an ordinary person to identify a specific individual's video and videogames purchasing

17   behavior.

18          42.    When a customer purchases a pre-recorded DVD or Blu-ray video or videogame,

19   the Purchase event transmits the Uniform Resource Locator ("URL") accessed, which contains the

20   title ID ("Title ID") of the purchased DVD, Blu-ray video, or videogame, an example of which is

21   shown in Figure #2 below:

22

23

24

25

26

27

28

1

**Figure #2**



2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24     43.    The Title ID of the purchased DVD and/or Blu-ray video can be used to identify the

25     movie by an ordinary person as follows.  The Title ID can be entered into the search bar on any of

26     Defendants' websites, and the title of the purchased video is then identified, as shown in Figure #3

27     below:

28

**Figure #3**



44. A visitor who had not logged out of Facebook while purchasing a video or videogame on Defendants' websites would transmit the c_user cookie to Facebook. The c_user cookie contains that visitor's unencrypted Facebook ID. When accessing the above video, for example, the Meta Pixel on Defendants' websites compelled the visitor's browser to send multiple cookies, in addition to the c_user cookie, as shown in Figure #4 below:

**Figure #4**

| Name | ▲ | Value |
| --- | --- | --- |
| c_user | | 10000 ▇▇▇▇▇ ← |
| datr | | saFWZXu696kRJfnBDt3cUDkn |
| fr | | 12ku163EnBwCtjWps.AWX0k1uyp6JGlDbA... |
| presence | | EDvF3EtimeF1717420984EuserFA21B0311... |
| ps_n | | 1 |
| sb | | saFWZTYcT89vhNpJu_mc48fL |
| usida | | eyJ2ZXIiOjEsImlkIjoiQXNlaWFFpZTNtb2F3Y... |
| xs | | 9%3AdXxBtLEXwuwdrA%3A2%3A1716322... |

45. A Facebook ID, along with the title of the prerecorded video or videogame purchased, is PII. Anyone can identify a Facebook profile-and all personal information publicly listed on that profile, including a person's first and last name—by appending the Facebook ID to the end of Facebook.com. For example, Meta CEO Mark Zuckerberg's Facebook ID is four and the URL "www.facebook.com/4" will take you to Mark Zuckerberg's Facebook page.

46.    By compelling a visitor's browser to disclose the c_user cookie alongside event data for videos, Defendants knowingly and intentionally disclosed information sufficient for an ordinary person to identify a specific individual's video and videogame viewing and purchasing behavior.

47.    When a visitor's browser had recently logged out of Facebook, Defendants' websites compelled the browser to send a smaller set of cookies, which are shown in Figure #5 below:

**Figure #5**

| datr | saFWZXu696kRJfnBDt3cUDkn |
| fr | 1i1olLNOUTIVrEu8l.AWVb7joBQBKPDnwLnRKM6E94... |

48.    The fr cookie contains, at least, an encrypted Facebook ID and browser identifier.[30] The datr cookies also identifies a browser.[31]  Facebook, at a minimum, uses the fr cookies to identify users.[32]

49.    Without a corresponding Facebook ID, the fr cookie contains, at least, an abbreviated and encrypted value that identifies the browser. Upon information and belief, Facebook uses the cookie for targeted advertising.

50.    Facebook, at a minimum, uses the fr and c_user cookies to link Facebook IDs and corresponding Facebook profile.

**IV.    Defendants Knowingly and Intentionally Disclosed Customers' Personally Identifiable Information to Third Parties Other than Meta**

51.    Defendants maintain a vast digital database comprised of their customers' Personally Identifiable Information, including, *inter alia*, the names and addresses of each customer and information reflecting the titles of all video and other audio-visual products that each of their customers have purchased.

---

[30] DATA PROTECTION COMMISSIONER, FACEBOOK IRELAND LTD, REPORT OF RE-AUDIT (Sept. 21, 2012), http://www.europe-v-facebook.org/ODPC_Review.pdf.
[31] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.
[32] *Id.*

52.     During the time period relevant to this action, Defendants monetized this database by renting, selling, or otherwise disclosing their customers' Personally Identifiable Information to data aggregators, data brokers, data appenders, and data cooperatives – including Data Axle, Inc., Wiland, Inc., Epsilon Data Management, LLC, and Path2Response, LLC – as well as other third-party renters and exchangers of their customers' Personally Identifiable Information, also without their customers' consent or knowledge.

53.     These factual allegations are corroborated by publicly available evidence. For instance, as shown in the screenshot below, during the time period relevant to this action, Defendants offered for sale, rental, or exchange the Personally Identifiable Information of 384,538 American consumers who purchased Defendants' video products in a "datacard," titled "ALLIANCE ENTERTAINMENT MUSIC & DVD MASTERFILE Mailing List," that they advertised on the website of NextMark, Inc. ("NextMark") – one of many companies that broker the purchase of this type of Personally Identifiable Information – at a base price of "$105.00/M [per thousand records]" (10.5 cents each):



54.     The "ALLIANCE ENTERTAINMENT MUSIC & DVD MASTERFILE" list offered by Defendants for sale by NextMark, shown in the screenshot above, contains Personally Identifiable Information for each of the 384,538 consumers whose information appears on the list, including each person's name, postal address, e-mail address, gender, age, and income, as well as the particular audio-visual product(s) they purchased from Defendants (i.e., the titles of the DVD and Blu-ray videos purchased) and the amount of money they spent on those purchases.

55.     As a result of Defendants' data compiling and sharing practices, companies have obtained and continue to obtain the Personally Identifiable Information of Defendants' customers, together with additional sensitive personal information that has been appended thereto by data appenders (such as Epsilon Data Management, LLC, to whom Defendants had transmitted their entire customer database (together with all of their customers' Personally Identifiable Information)), and others.

56.     During the time period relevant to this action, Defendants routinely and systematically transmitted Plaintiffs' and all of their other customers' Personally Identifiable Information to Wiland, Inc., including but not limited to for the purpose of participating in Wiland's data cooperative.

57.     During the time period relevant to this action, Defendants routinely and systematically transmitted Plaintiffs' and all of their other customers' Personally Identifiable Information to Epsilon Data Management, LLC, including but not limited to for the purpose of having Epsilon "enhance" their customer files by appending additional demographic and personal information about each customer – which, in turn, allowed Defendants to then sell, rent, and otherwise disclose their customers' Personally Identifiable Information, enhanced with the additional appended demographic and personal data about each customer, for more money.

58.     During the time period relevant to this action, Defendants routinely and systematically transmitted Plaintiffs' all of their other customers' Personally Identifiable Information to Data Axle, Inc. and Path2Response, LLC, including but not limited to for the purposes of utilizing these companies' marketing, data management, list rental, data analytics, and other services.

59.     As a result of Defendants' disclosures of their customers' Personally Identifiable Information, any person could obtain a list with the names and addresses of all women over the age of 60 who reside in Connecticut and spent more than $75.00 purchasing DVD or Blu-ray movies featuring Burt Lancaster from Defendants during the past 12 months. Such a list is available for sale for approximately $178.00 per thousand customers listed.

60.     Defendants' disclosures of their customers' Personally Identifiable Information have put their customers at risk of serious harm from scammers.

61.     Defendants did not seek, let alone obtain (in writing or otherwise), Plaintiffs' or their other customers' written consent prior to disclosing their Personally Identifiable Information to third parties, and their customers remain unaware that their Personally Identifiable Information and other sensitive data has been trafficked by Defendants (and/or is being trafficked by other parties as a result of Defendants' actions) on the open market in these ways.

### V.     Plaintiffs' Experiences with Defendants' Websites

62.     Each of the Plaintiffs had created a Facebook account and has had a Facebook account when they each purchased video materials from one of the Defendants' websites.

63.     In 2023 and 2024, each of the Plaintiffs purchased prerecorded video materials from one or more of Defendants' websites.

64.     When Plaintiffs purchased videos on Defendants' websites, on information and belief, Defendants disclosed to Facebook each of their Facebook IDs, browser identifiers, and other identifying information.

65.     When each of the Plaintiffs purchased videos on Defendants' websites, on information and belief, Defendants disclose each of their purchase data. This purchase data, which Defendants transmitted through first-party cookies, contained the Title IDs of the prerecorded videos that Plaintiffs purchased on Defendants' websites.

### TOLLING OF THE STATUES OF LIMITATIONS

66.     Each unauthorized transmission of Plaintiffs' and other customers' Personally Identifiable Information by Defendants is a separate unlawful act that triggers anew the relevant statute of limitations. Moreover, each sale, rental, or other disclosure of customers' Personally

Identifiable Information by Defendants to other third parties, including data aggregators and data brokers is a separate unlawful act that triggers anew the relevant statute of limitations.

67.    Additionally, any applicable statutes of limitation have been tolled by: (1) the fraudulent concealment doctrine based on Defendants' knowing and active concealment and denial of the facts alleged herein including but not limited to their incorporation of the tracking pixels and devices and their sale and/or rental of customers' Personally Identifiable Information to third parties, including data aggregators and data brokers; and (2) the delayed discovery doctrine, as Plaintiffs and customers did not and could not reasonably have discovered Defendants' conduct alleged herein until shortly before the filing of this Complaint. Plaintiffs and customers did not discover and could not reasonably have discovered that Defendants were disclosing and releasing their Personally Identifiable Information in the ways set forth in this Complaint until shortly before this lawsuit was filed in consultation with counsel.

68.    The Meta Pixel, and other tracking tools on Defendants' websites, were entirely invisible to website visitors.

69.    Defendants did not disclose to Plaintiffs and other customers that they had sold and/or rented their Personally Identifiable Information to third parties, including data aggregators and data brokers.

70.    Through no fault of their own or lack of diligence, Plaintiffs and other customers were deceived and could not reasonably discover Defendants' unlawful conduct. Defendants' Privacy Policy does not inform Defendants' customers that their Personally Identifiable Information will be disclosed to unauthorized third parties such as Meta or Epsilon, Wiland, Data Axle, or Path2Response, as described in this Complaint.

71.    Plaintiffs were therefore ignorant of the information essential to pursue their claims, without any fault or lack of diligence on their part.

72.    Defendants have exclusive knowledge that Defendants' websites incorporate the Meta Pixel, and other tracking tools, and the information those pixels and tools were configured to collect and disclose, and yet Defendants failed to fail to disclose to their website visitors, including Plaintiffs and other customers, that by interacting with Defendants' websites their PII would be

disclosed to, released to, or intercepted by Meta and other unauthorized third parties.

73.    Defendants also had exclusive knowledge of any instances in which they rented or sold their customers' Personally Identifiable Information to third parties, including data aggregators and data brokers, and yet Defendants failed to disclose to their customers, including Plaintiffs, that by interacting with Defendants' websites their PII would be sold, rented, or otherwise disclosed to third parties, including data brokers and data aggregators.

74.    Under the VPPA and California law, Defendants were under a duty to disclose the nature, significance, and consequences of their collection and treatment of website visitors' and customers' PII. However, to date, Defendants have not conceded, acknowledged, or otherwise indicated to their customers and other website visitors that they disclosed or released their PII to unauthorized third parties. Accordingly, Defendants are estopped from relying on any statute of limitations.

75.    Moreover, all applicable statutes of limitation have also been tolled pursuant to the discovery rule.

## CLASS ACTION ALLEGATIONS

76.    Plaintiffs bring this action, on behalf of themselves and all others similarly situated, under Federal Rules of Civil Procedure, Rule 23, on behalf of the following class (the "Class" or "Class Members"):

> All natural persons residing in the United States who purchased a video or videogame from Defendants or signed up to receive notices about videos or videogames from Defendants, and about whom information which identified such persons as having requested or obtained specific video materials or services from Defendants was disclosed to a third party, including, but not limited to, Meta, Epsilon, Wiland, Data Axle, or Path2Response.

77.    Pursuant to Rule 23, Plaintiffs also seek to represent the following sub-Class ("California sub-Class") consisting of:

> All natural persons residing in California who purchased a video or videogame from Defendants or signed up to receive notices about videos or videogames from Defendants, and about whom information which identified such persons as having requested or obtained specific video materials or services from Defendants may have been disclosed to a third

party, including, but not limited to, Meta, Epsilon, Wiland, Data Axle, or Path2Response.

78.     Excluded from the Class and California sub-Class are Defendants, their employees, agents and assigns, and any members of the judiciary to whom this case is assigned, their respective court staff, the members of their immediate families, and Plaintiffs' counsel.

79.     Plaintiffs reserve the right to revise or amend the above Class or California sub-Class definition based on the discovery of new information.

80.     **Numerosity (Rule 23(a)(1)):** The potential members of the proposed Class and California sub-Class as defined and identified herein, are, on information and belief, more than one hundred, and so numerous that joinder of all members of the Class is impracticable.

81.     **Typicality (Rule 23(a)(3)):** Plaintiffs' claims are typical of the claims of the Class and California sub-Class. Each of the Plaintiffs has been a customer of Defendants since 2023, they each used one of Defendants' websites to purchase prerecorded videos and, as a result, each of their PII was disclosed to various third parties, including Meta, Epsilon, Wiland, Data Axle, and Path2Response, all without their informed written consent.

82.     **Commonality (Rule 23(a)(2)):** Common questions of fact and law exist as to all Class Members and California sub-Class Members and predominate over the questions affecting only individual members of the Class. With respect to the Class Members and California sub-Class Members these common questions include but are not limited to:

(a)     Whether Defendants had Meta Pixels embedded on their three U.S. websites that disclosed Class Members' and California sub-Class Members' PII to Meta and/or any other unauthorized third party;

(b)     Whether Defendants rented, sold, or otherwise disclosed their customers' Personally Identifiable Information to third parties;

(c)     Whether Defendants are engaged in the business of "rental, sale, or delivery of prerecorded video cassette tapes or similar audio-visual materials" and, thus, are "video tape service providers" within the meaning of 18 U.S.C. § 2710(a)(4);

(d)     Whether Class Members and California sub-Class Members are "subscriber[s] of goods or services from a video tape service provider" and, thus, are "consumers" within the meaning of 18 U.S.C. § 2710(a)(1);

(e)     Whether Class Members and California sub-Class Members are "purchaser[s] . . . of goods or services from a video tape service provider" and, thus, are "consumers" within the meaning of 18 U.S.C. § 2710(a)(1);

(f)     Whether Class Members' and California sub-Class Members' information that was collected, disclosed, and shared by Defendants with unauthorized third parties, including Meta, constitutes PII within the meaning of the Video Privacy Protection Act, 18 U.S.C. §§ 2710 *et seq.*;

(g)     Whether Class Members' and California sub-Class Members' information that was rented, sold, or otherwise disclosed to third parties, including but not limited to data aggregators, data appenders, data cooperatives, and data brokers, including but not limited to Epsilon, Wiland, Data Axle, and Path2Response, constitutes PII within the meaning of the Video Privacy Protection Act, 18 U.S.C. §§ 2710 *et seq.*;

(h)     Whether Defendants obtained "informed, written consent" from Class Members and California sub-Class Members within the meaning of 18 U.S.C. § 2710(b)(2)(b);

(i)     Whether Defendants' acts and practices violated the Video Privacy Protection Act, 18 U.S.C. §§ 2710 *et seq.*;

(j)     Whether the Class and California sub-Class are entitled to liquidated penalties under 18 U.S.C. § 2710(c)(2)(A), as a result of Defendants' conduct;

(k)     Whether the information Defendants disclosed to Meta and disclosed/rented/sold to other third parties concerning Class Members' and California sub-Class Members' video views and downloads constitutes "personal information or the contents of any record, including sales or rental information, which is prepared or maintain" by Defendants within the meaning of Cal. Civ. Code § 1799.3(a);

(l)     Whether Defendants knowingly and intentionally disclosed and/or rented or sold Plaintiffs', Class Members', and California sub-Class Members' "personal information or the contents of any record, including sales or rental information" to Meta within the meaning of Cal. Civ.

Code § 1799.3(a);

(m)    Whether Class Members and California sub-Class Members provided written consent to Defendants' disclosures of their personal information or record contents to Meta and/or other third parties within the meaning of Cal. Civ. Code § 1799.3(a);

(n)    Whether Defendants' acts and practices violated Cal. Civ. Code § 1799.3;

(o)    Whether the Class and California sub-Class are entitled to civil penalties under Cal. Civ. Code § 1799.3(c), as a result of Defendants' conduct;

(p)    Whether Defendants' acts and practices violated Business and Professions Code §§ 17200, *et seq*;

(q)    Whether Defendants' acts and practices harmed Plaintiffs, Class Members and California sub-Class Members;

(r)    Whether Plaintiffs, Class Members, and California sub-Class Members are entitled to an injunction and equitable relief, including but not limited to, restitution and disgorgement of profits;

(s)    Whether Plaintiffs, Class Members, and California sub-Class Members are entitled to damages and other monetary relief, and if so, what is the appropriate amount of damages or other monetary relief; and

(t)    Whether Plaintiffs, Class Members, and California sub-Class Members are entitled to reasonable attorneys' fees and costs.

83.    **Adequacy of Representation (Rule 23(a)(4))**: Plaintiffs will fairly and adequately protect the interests of the Class and California sub-Class. Plaintiffs' interests do not conflict with those of the Class, they are not subject to any unique defenses, and they have retained competent and experienced counsel that has experience in complex consumer protection class action and cases, as well as sufficient financial and legal resources to prosecute this case on behalf of the Class. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Class and California sub-Class. Plaintiffs and counsel anticipate no difficulty in managing the litigation of this case as a class action.

84.    **Predominance and Superiority (Rule 23(b)(3)):** In addition to satisfying the prerequisites of Rule 23(a), Plaintiffs satisfy the requirements for maintaining a class action under Rule 23(b)(3). Common questions of law and fact predominate over any questions affecting only individual members of the Class and California sub-Class, and a class action is superior to individual litigation and all other available methods for the fair and efficient adjudication of this controversy. Here, common issues predominate because liability can be determined on a class-wide basis even if some individualized damages determination may be required. Individualized litigation also presents a potential for inconsistent or contradictory judgments, and increases the delay and expense presented by complex legal and factual issues of the case to all parties and the court system. Furthermore, the expense and burden of individual litigation make it impossible for Class Members and California sub-Class Members to individually redress the wrongs done to them and individual Class Members and California sub-Class Members do not have a significant interest in controlling the prosecution of separate actions. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court. If this action is not certified as a class action, it will be impossible as a practical matter for many or most Class Members and California sub-Class Members to bring individual actions to recover money from Defendants, due to the relatively small amounts of such individual recoveries relative to the costs and burdens of litigation. Plaintiffs anticipate no difficulty in the management of this action which would preclude its maintenance as a class action.

85.    Plaintiffs reserve the right to add representatives for the Class or and California sub-Class, provided Defendants are afforded an opportunity to conduct discovery as to those representatives.

## FIRST CAUSE OF ACTION

### *Violation of the Video Privacy Protection Act, 18 U.S.C. §§ 2710, et seq.*

### **[By All Plaintiffs, Individually and on Behalf of Members of the Class]**

86.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

87.    The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally identifying information" concerning any "consumer" to a third party without the "informed, written consent . . . of the consumer" and the opportunity to opt out of disclosures. See generally 18 U.S.C. § 2710.

88.    Defendants are each a "video tape service provider" because each is "engaged in the business, in or affecting interstate commerce, of rental, sale, or delivery of prerecorded . . . audiovisual materials." 18 U.S.C. § 2710(a)(4).

89.    Plaintiffs and Class Members are "consumers" because they are "subscribers" to Defendants' services, each having purchased a video or videogame from the libraries of pre-recorded videos and videogames on Defendants' websites. 18 U.S.C. § 2710(a)(1).

90.    Plaintiffs and Class Members are "consumers" because they are "purchasers" of goods and services, in the form of DVDs, Blue-ray videos, and videogames from the libraries of pre-recorded videos and videogames sold on Defendants' websites. 18 U.S.C. § 2710(a)(1).

91.    During the Class Period, Defendants systematically disclosed the "personally identifiable information" of each of the Plaintiffs and Class Members to numerous third parties, including but not limited to Meta, Wiland, Epsilon, Data Axle, and Path2Response, because Defendants transmitted, sent, or otherwise disclosed to these third parties "information which identifies a person as having requested or obtained specific video materials" from Defendants' website(s), 18 U.S.C. § 2710(a)(3), including, but not limited to, the title and/or identity of every video purchased alongside information that would permit an ordinary person to identify the purchaser.

92.    Prior to disclosing Plaintiffs' and Class Members' "personally identifiable information," as alleged above, Defendants failed to request, much less obtain, "informed, written consent" from any of the Plaintiffs or Class Members, in the manner and form required by 18 U.S.C. § 2710(b)(2)(B), and consequently failed to provide Plaintiffs and Class Members the opportunity to withdraw any such consent, as required by 18 U.S.C. § 2710(b)(2)(iii).

93.    Defendants knowingly disclosed Plaintiffs' and Class Members' PII to numerous third parties. In particular, Defendants intentionally installed, embedded, and/or otherwise permitted the presence of the Meta Pixel on their websites and knew that this pixel and tracking tool would

gather and disclose the titles and/or identities of prerecorded videos purchased by Plaintiffs and Class Members – all for the purposes of enhancing the formidability of their marketing operations and thus increasing their bottom line.  In addition, Defendants intentionally advertised the availability of, and then intentionally sold, rented, exchanged, and otherwise disclosed, all of their customers' PII to various third party data companies, including but not limited to Wiland, Epsilon, Data Axle, and Path2Response – all for the purposes of making more money and thus increasing their bottom line.

94.     By knowingly disclosing Plaintiffs' and Class Members' personal viewing habits, Defendants violated Plaintiffs' and Class Members' statutorily protected right to privacy in their video-viewing habits and activities. See 18 U.S.C. § 2710(c).

95.     As a result of the above-described violations, Defendants are liable to Plaintiffs and each Class Member for actual damages in an amount to be determined at trial or, alternatively, for "liquidated damages in an amount of $2,500." 18 U.S.C. § 2710(c)(2)(A). Under the Act, Defendants are also liable for reasonable attorneys' fees, other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury and sufficient to prevent and deter the same or similar conduct by Defendants in the future.

96.     Plaintiffs, on behalf of themselves and the Class, seek relief as further described below.

## SECOND CAUSE OF ACTION

### Violation of Cal. Civ. Code § 1799.3

**[By Plaintiff Hoang To, Individually and on Behalf of Members of the California sub-Class]**

97.     Plaintiff Hoang To re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

98.     Cal. Civ. Code § 1799.3(a) prohibits video sellers from disclosing "any personal information or the contents of any record, including sales or rental information, which is prepared or maintained by that person, to any person, other than the individual who is subject of the record, without the written consent of that individual".

99.     Defendants are each a "person providing video recording sales or rental services"

under Cal. Civ. Code § 1799.3(a) because they are in the business of selling prerecorded videos and videogames.

100.    Defendants knowingly and intentionally disclosed information that identified Plaintiff Hoang To's and California sub-Class Members' video DVD, Blu-ray video, and videogame purchase history to Meta, including their Facebook ID's and the title of the videos or videogames that Plaintiff Hoang To and California sub-Class Members purchased. In addition, Defendants knowingly and intentionally disclosed Plaintiff Hoang To's and California sub-Class Members' PII, including their identity along with video and videogame purchase history, to numerous other third parties, including but not limited to Meta, Wiland, Epsilon, Data Axle, and Path2Response.

101.    Plaintiff Hoang To and California sub-Class Members did not consent, in writing or otherwise, to Defendants' disclosures of their video or videogame purchases to third parties. Defendants' disclosures of this information to third parties therefore violated Cal. Civ. Code § 1799.3(a).

102.    Plaintiff Hoang To, on behalf of himself and the California sub-Class, seeks relief as further described below.

### **THIRD CAUSE OF ACTION**

***Violation of California's Unfair Competition Law (UCL), Cal. Bus. & Prof. Code § 17200***

**[By Plaintiff Hoang To, Individually and on Behalf of Members of the California sub-Class]**

103.    Plaintiff Hoang To re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

104.    The UCL prohibits unfair competition in the form of any unlawful, unfair, or fraudulent business act or practice.  California Business & Professions Code § 17204 allows "any person who has suffered injury in fact and has lost money or property" to prosecute a civil action for violation of the UCL.

105.    Defendants' acts, omissions, practices, and non-disclosures as alleged herein constituted unlawful, unfair, and fraudulent business acts and practices within the meaning of Cal. Bus. & Prof. Code §§ 17200, *et seq*.

106.    The UCL draws upon various sources of law to establish regulations and standards for business practices within California. Defendants have engaged and continues to engage in business acts and practices that are unlawful because they violate Cal. Civ. Code. § 1799.3 and the VPPA, as set forth in this complaint.

107.    Defendants' acts and practices are also "unfair" in that they are immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to consumers. Defendants secretly disclosed, released, rented and/or sold, and otherwise misused Plaintiff Hoang To's and California sub-Class Members' video viewing information, with no corresponding benefit to its affected customers and other website visitors. And, because customers were unaware of Defendants' incorporation of tracking tools into their websites and/or that Defendants would disclose and release their video viewing information to unauthorized third parties, they could not have avoided the harm.

108.    Defendants should be required to cease their unfair and/or illegal disclosures of their customers' PII. Defendants have reaped and continue to reap unjust profits and revenues in violation of the UCL.

109.    "Actions for relief" under the UCL may be brought by various government officials and "by a person who has suffered injury in fact and has lost money or property as a result of the unfair competition." Bus. & Prof. Code § 17204.

110.    Plaintiff Hoang To has suffered injury in fact and has lost money or property as a result of Defendants' acts and practices because he would not have paid for Defendants' products or services had he known that Defendants were disclosing his and Defendants' other customers' personal identifiers and video viewing information to unauthorized third parties in violation of their legal obligations, social norms, and reasonable consumer expectations.

111.    To protect consumers from Defendants' unfair and/or unlawful practices, Plaintiff Hoang To seeks an order from this Court enjoining Defendants from unlawfully disclosing California sub-Class Members' private information about their personal video-viewing habits and activities to unauthorized third parties without their customers' informed and written consent.

112.    Plaintiff Hoang To lacks an adequate remedy at law because the ongoing harms from Defendants' collection and disclosure of their customers' information must be addressed by public

injunctive relief and, due to the ongoing and nature of the harm, the harm cannot be adequately addressed by monetary damages alone.

113.    This action, if successful, will enforce an important right affecting the public interest and would confer a significant benefit on the general public.  Private enforcement is necessary and places a disproportionate financial burden on Plaintiff Hoang To in relation to Plaintiff Hoang To's stake in the matter.  Because this case is brought for the purposes of enforcing important rights affecting the public interest, Plaintiff Hoang To also seeks the recovery of attorneys' fees and costs in prosecuting this action against Defendants under Code of Civil Procedure § 1021.5 and other applicable law.

114.    Plaintiff Hoang To seeks relief as further described below.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs pray for relief and judgement as follows:

115.    An order appointing Plaintiffs as the Class Representatives of the Class and Plaintiff Hoang To as Class Representative of the California sub-Class;

116.    An order certifying the Class and California sub-Class as requested and appointing the undersigned attorneys as Class Counsel;

117.    An order declaring that Defendants' conduct violates the statutes referenced herein;

118.    An order awarding Plaintiffs and Class Members actual damages but not less than liquidated damages in an amount of $2,500 per Plaintiff and Class Member per violation of the Video Privacy Protection Act, 18 U.S.C. §§ 2710, *et seq.*;

119.    An order awarding Plaintiff Hoang To and each California sub-Class Member a civil penalty of $500 per violation pursuant to Cal. Civ. Code § 1799.3(c);

120.    An order restoring to Plaintiff Hoang To and other California sub-Class Member any money and property acquired by Defendants through their wrongful conduct;

121.    An injunction forbidding Defendants from disclosing information about their customers' video and videogame viewing choices to third parties pursuant to 18 U.S.C. § 2710(c)(2)(D) and pursuant to Cal. Bus. & Prof. Code §§ 17200 *et seq.*;

122.    An award of reasonable attorneys' fees and costs of suit, including costs of

investigation pursuant to 28 U.S.C § 2710(c)(2)(C), Cal. Civ. Proc. § 1021.5 and any other applicable law;

123.    An award of pre- and post-judgment interest as provided by law; and

124.    An award of such other and further relief, at law and in equity, as the nature of this case may require or as this Court deems just and proper.

<u>**DEMAND FOR JURY TRIAL**</u>

Plaintiffs, on behalf of themselves and all other members of the Class and California sub-Class, hereby demand a jury trial on all claims and issues so triable.

Dated: February 7, 2025                                Respectfully submitted,

                                                    *s/ Julian Hammond*
                                                    JULIAN HAMMOND (SBN 268489)
                                                    jhammond@hammondlawpc.com
                                                    POLINA BRANDLER (SBN 269086)
                                                    pbrandler@hammondlawpc.com
                                                    ARI CHERNIAK (SBN 290071)
                                                    acherniak@hammondlawpc.com
                                                    HAMMONDLAW, P.C.
                                                    1201 Pacific Ave, 6th Floor
                                                    Tacoma, WA 98402
                                                    (310) 807-1666

                                                    FRANK S. HEDIN (SBN 291289)
                                                    fhedin@hedinllp.com
                                                    HEDIN LLP
                                                    1395 Brickell Ave, Suite 610
                                                    Miami, Florida 33131
                                                    (305) 357-2107 (Office)
                                                    (305) 200-8801 (Fax)

                                                    *Attorneys for Plaintiffs and the Putative Classes*