Teresa C. Chow (State Bar No. 237694)
**BAKER & HOSTETLER LLP**
1900 Avenue of the Stars
Suite 2700
Los Angeles, CA  90067-4301
Telephone:     310.820.8800
Facsimile:     310.820.8859
Email:          *tchow@bakerlaw.com*

Bonnie Keane DelGobbo (*pro hac vice*)
Joel C. Griswold (*pro hac vice*)
**BAKER & HOSTETLER LLP**
One North Wacker Drive
Suite 3700
Chicago, IL  60606
Telephone:     312.416.6200
Facsimile:     312.416.6201
Email:          *bdelgobbo@bakerlaw.com*
Email:          *jcgriswold@bakerlaw.com*

*Attorneys for Defendants*
DIRECTTOU, LLC and ALLIANCE
ENTERTAINMENT, LLC

**IN THE UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JONATHAN HOANG TO, JEFFRY HEISE, and JOSEPH MULL, individually and on behalf of all others similarly situated,<br><br>            Plaintiff,<br><br>    v.<br><br>DIRECTTOU, LLC and ALLIANCE ENTERTAINMENT, LLC,<br><br>            Defendants. | **CASE NO.: 3:24-CV-06447-WHO**<br><br>**DECLARATION OF BONNIE KEANE DELGOBBO IN SUPPORT OF MOTION TO STAY AND COMPEL ARBITRATION**<br><br>*[Filed concurrently with Notice of Motion; Motion; Memorandum of Points and Authorities; Declaration; and Proposed Order]*<br><br>Hearing:     April 16, 2025<br>Time:        2:00 PM |

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

## DECLARATION OF BONNIE KEANE DELGOBBO

I, Bonnie Keane DelGobbo, declare as follows:

1.    I am an attorney at law admitted *pro hac vice* in this action.  I am a partner at the law firm of Baker & Hostetler LLP, counsel of record for Defendants DirectToU, LLC ("DirectToU") and Alliance Entertainment, LLC ("Alliance") (collectively, "Defendants").  I have personal knowledge of the facts set forth herein except as to those facts that are asserted on information and belief, and, as to those facts, I believe them to be true.  If called as a witness, I could and would testify competently as follows:

2.    I make this declaration in Support of Defendants' concurrently filed Motion to Stay and Compel Arbitration ("Motion").

3.    I ordered the transcript of the December 4, 2024 hearing on Plaintiff Hoang To's Motion for Preliminary Approval of Class Action Settlement. (ECF No. 56.) A true and correct copy of the transcript is attached hereto as Exhibit A.

4.    I ordered the transcript of the February 4, 2025 Case Management Conference. (ECF No. 77.) A true and correct copy of the transcript is attached hereto as Exhibit B.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 10th day of March, 2025 at Chicago, Illinois.


By:    /s/Bonnie Keane DelGobbo
       Bonnie Keane DelGobbo

*Attorneys for Defendants*
DIRECTTOU, LLC and ALLIANCE
ENTERTAINMENT, LLC

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

# EXHIBIT A

Pages 1 - 25

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ORRICK

JONATHAN HOANG TO,               )
                                 )
            Plaintiff,           )
                                 )
  vs.                            ) No. C 24-6447 WHO
                                 )
DIRECTTOU, LLC,                  )
                                 )  San Francisco, California
            Defendant.           )  Wednesday
                                 )  December 4, 2024
_____  )  2:00 p.m.

**TRANSCRIPT OF ZOOM VIDEO CONFERENCE PROCEEDINGS**

**APPEARANCES**:

**For Plaintiff:**          HAMMONDLAW, P.C.
                            1201 Pacific Avenue
                            Sixth Floor
                            Tacoma, Washington 98402
                      BY:   **JULIAN HAMMOND, ESQ.**
                            **POLINA BRANDLER, ESQ.**
                            **ADRIAN BARNES, ESQ.**

**For Defendant:**          BAKER HOSTETLER, LLP
                            One North Wacker Drive
                            Suite 3700
                            Chicago, Illinois 60606
                      BY:   **JOEL GRISWOLD, ESQ.**

**For Intervenor:**         HEDIN, LLP
                            1395 Brickell Avenue
                            Suite 1140
                            Miami, Florida 33131
                      BY:   **FRANK HEDIN, ESQ.**

*Reported By:   Debra L. Pas, CSR 11916, CRR, RMR, RPR*
               Official Reporter - US District Court
               Computerized Transcription By Eclipse

1                    **P R O C E E D I N G S**

2  **Wednesday, December 3, 2024**                    **2:56 p.m.**

3                          ---o0o---

4          **THE CLERK:**  We will get underway then in Case No.

5  24-6447, Hoang To versus DirectToU, LLC.

6      Counsel, if you would, please, state your appearance for

7  the record.

8          **MR. HAMMOND:**  Yes.  Good afternoon.  Julian Hammond,

9  with my colleagues Polina Brandler and Adrian Barnes from

10  HammondLaw.

11          **MR. GRISWOLD:**  Joel Griswold on behalf of the

12  defendant from Baker Hostetler.

13          **MR. HEDIN:**  And good afternoon.  Frank Hedin on

14  behalf of the proposed intervenors.

15          **THE COURT:**  All right.  Good afternoon to you all.

16      So let me tell you the issue that I'm most interested in

17  is -- and I'm going to have some questions for you -- is

18  whether the plaintiffs have achieved fair value for the class.

19  So that's -- that's what I'm really focused on.

20      Before I get there, for the motions to intervene or

21  dismiss, to me, they -- the key -- some of the key facts are

22  that these two cases were filed at about the same time.  Both

23  cases, settlement discussions started within a month.

24      The -- in the *Feller* case the defendant wanted to include

25  the To plaintiffs -- or To plaintiffs -- and the *Feller* folks

 1  didn't want that in the mediation.

 2      And the To case, again, agreed to a settlement proposal

 3  that had been, I guess, rejected by *Feller*, but without any

 4  knowledge of what was going on in the *Feller* mediation.

 5      I'm going to deny intervention in the same as I did in the

 6  Perkins case and in the case we just had, the Harvey case, but

 7  encourage the objections and allow argument as I'm going

 8  through the matter.

 9      And I -- I'm going to deny the motion to dismiss, stay or

10  transfer based on first to file.

11      This case, the To case, has proceeded to the point where

12  it would be ineffective to stay and it would defeat judicial

13  economy, which is really the purpose of that first-to-file

14  rule, in my judgment anyway.

15      So I want to go to the -- and I'll let you argue about

16  this, Mr. Hedin, but I do want to first go to the settlement

17  and preliminary approval.

18      So my understanding is that the proposed payment is a $6

19  gross, $4 net per class member, and it's very unclear to me how

20  I'm supposed to evaluate that amount.

21      The To cases were based on Pixel claims.  They didn't

22  include claims regarding selling data to brokers or others

23  and -- at least that's the way that I understand it.  And if --

24  if those -- if I'm right about that, I would like to know how

25  the To plaintiffs value Meta claims versus data brokerage

1    claims.

2         **MR. HAMMOND:**  Thank you, Your Honor.

3         So in terms of the -- in terms of the -- if you take this

4    as a straight Pixel case, I believe that the claims or the

5    settlement fits the higher end of the range likely submitted in

6    the papers.

7         If you take it as a -- in terms of the data brokerage

8    cases, we've done a -- our due diligence and our investigation

9    into those cases, and it appears that the proposed intervenors

10   are taking this case and valuing the case like the Michigan

11   privacy cases from -- Michigan proxy cases, which is a

12   different -- different piece of legislation with -- with --

13   it's sort of an apples-to-orange case.

14        When we're looking at the -- the actual issues in this

15   case compared to those types of cases, the Michigan privacy

16   cases, which we acknowledge settled for a significantly higher

17   dollar value, those were the cases where -- were examples

18   where, for instance, the economists, they -- the economists

19   sold their list of subscribers.

20        There is no argument there in those cases that the -- that

21   the -- that the title of the book, for the Michigan privacy

22   cases, was disclosed along with the name and address and email

23   address of the subscribers.  So the factual predicate in -- in

24   those privacy cases were significantly, significantly stronger.

25        In these cases, you've got the data brokerage cases --

1  you've got the data brokers, who -- where the -- the

2  information was contained on a -- on the defendant's own

3  website, but in multiple different lists where -- evidence --

4  where, from our investigation, it appears to be almost -- or

5  very difficult, if not impossible, for the -- for anyone to

6  match up the lists, if those lists actually exist.

7      If you take a look at the proposed -- well, the *Feller*

8  complaint and the actual evidence that they -- that they

9  imported or inserted into their complaint with what their

10  evidence is, it actually doesn't say that they are selling the

11  lists, the list of people, along with their video -- with the

12  videos that they actually purchased or the DVDs or the video

13  games that they purchased.

14      So I believe in this case it's an apples-to-orange

15  comparison.  It's a very, very different -- with a different

16  statute and very, very different factual predicate.

17      In addition --

18          **THE COURT:**  So now I'm still waiting for an answer to

19  my question.  I appreciate the distinctions between the

20  Michigan cases.  They are also older cases.

21      But I'm asking how you value these cases and why wouldn't

22  doing some discovery to find out whether the data brokers have

23  the -- use the information in the way that you think they do or

24  don't have the lists that you think?  Why wouldn't you be doing

25  that?

```
 1          But answer that first question.  There have to be other
 2   data breach cases that have dealt with these damages issues.
 3   What's a -- how are you looking at them?
 4          MR. HAMMOND:  So we look at them in a pretty
 5   similar -- in a pretty similar vein as the Pixel cases.  And
 6   that's -- that's ultimately why we -- we -- we came to the
 7   conclusion that it was a fair and reasonable settlement.
 8          Whether it be through the Pixel or the data brokerage, in
 9   this circumstance we thought, for various reasons, you have an
10   arbitration agreement where -- where if the arbitration
11   agreement was enforced, it would -- it would imperil -- imperil
12   any class action.
13          You've got -- you've got the claims of due process.  You
14   have the limitation of damages provision in the terms of use.
15          All these -- all these number of different points we
16   looked at and took into serious consideration when we -- when
17   we valued the claim.
18          You know, if the motion to compel arbitration was to be
19   filed and it was to be granted, it would eviscerate the class
20   claims.
21          If the limitation of damages claim was enforced, it would
22   completely -- it would eliminate, in essence, the statutory
23   damages claim and would reduce the claims to the amount of
24   damages -- or the amount that the class members paid.
25          THE COURT:  So are there no -- are there no
```

```
1   comparators that are -- with similar defendants around the

2   country under this statute?

3        Are you telling me you're just -- you're having to create

4   this out of whole cloth?

5            MR. HAMMOND:  There are no -- there are no data

6   breach -- there are no data brokerage VPPA cases that we have

7   identified.

8        We've done a -- we've settled on number of these Pixel

9   cases where -- where -- we actually have final approval in

10  another Pixel case with Judge Chhabria tomorrow.  So we're --

11  not a VPPA case, but another -- a Pixel -- Pixel-related case.

12       In terms of the VPPA cases, there's only six or seven

13  settlements that have been reached and this settlement is in

14  the upper range of -- the upper range of them.

15       If you're asking the question of whether or not discovery

16  would -- would -- would or could or potentially lead to a

17  result that would provide significant additional information,

18  the answer, of course, is yes, it would, but, you know, with

19  the settlements reached early in litigation all the time.

20       And in -- in terms of the risks of -- that we identified

21  in our briefing, we -- we -- we took the position that it was a

22  fair and reasonable settlement.  And that -- and that we -- we

23  believed it was a good result for the class and if -- you know,

24  if -- in this situation, you know, the -- if Your Honor

25  approved the settlement and approved the notice plan where it
```

would be a -- would be based on a claim form, the -- each --

based on a 5 percent claims rate, which is sort of the rates

that we've been seeing, that's $120 per person in terms of

relief.  And that's -- that's significant.

If you -- and if you compare that to the monetary math

that each class member paid, it's significantly more than

that -- that they paid per transaction.

So taking into account all those considerations, we

believed it was an excellent, excellent deal.  Would we take it

again tomorrow?  The answer is yes.

If -- if Your Honor is -- is -- believes that, you know,

there's -- you know, we should do some more discovery and --

and -- and look further into the data brokerage issues, then

that's -- then I -- I can't say that that -- that potentially

won't help, but from our initial discussions -- from our

initial discussions with the data brokerage companies and the

defendant and the evidence that -- that we have seen so far,

it -- it may lead to significant class cert -- class

certification issues, in terms of identifying who the class

members are -- well, not identifying class members, but whether

or not there was an actual violation given that the -- it

doesn't appear to be one list that identified the class members

with the videos they purchased.

            THE COURT:  Mr. Hedin, how do you -- what do you

think the reasonable full valuation of the claims is, and what

 1   do you think the more appropriate settlement range is?

 2          **MR. HEDIN:**  So we believe that Michigan cases do

 3   offer pretty solid comparators.  The *Sachinat* case provides for

 4   5,000 in damages.  The statute here provides for 2500.  So we

 5   -- and the underlying conduct in the Michigan cases and the

 6   conduct alleged in the *Feller* action concerning disclosures to

 7   data appenders and renters is identical to the comment that

 8   underlies the Michigan cases.

 9          **THE COURT:**  How about more recent cases?  Aren't

10   there more recent cases that would lend a -- I mean, I think

11   the view of the Court -- the Michigan statute is different, and

12   the view of the Courts with respect to these data cases is

13   changing all the time.

14       So I'm just interested in whether there isn't more or

15   better information than either of you have provided to me.

16          **MR. HEDIN:**  No.  I still believe that the Michigan

17   cases are the best.  The Michigan cases have been recently

18   settled.  One was settled against Mayo earlier this year that I

19   was involved in.  The case settled for 52 and a half million

20   dollars on behalf of 60-, I believe, 3,000 class members.  Each

21   person automatically got a check in the mail for over $500.

22       The -- the Michigan statute is not materially different in

23   any way from the VPPA.  The Michigan statute protected both

24   reading information and video information.  The VPPA covers

25   only video information.

1    But the Michigan statute also contains a much -- a notice

2  provision.  A defendant only needs to show that notice was

3  provided and an opportunity to opt out was provided.  The VPPA

4  requires consent.  So in many ways the VPPA is actually

5  stronger in terms of the strength of the claims.

6    So the -- the reason why the proposed settlement before

7  the Court, $6 head, is because that's the market rate for these

8  Pixel cases and because that's the only type of disclosure that

9  Mr. Hoang To and his counsel were aware of at the time they

10  negotiated -- and I'm going to put that in quotes -- and the

11  time they signed the agreement.  They had no knowledge of these

12  types of disclosures.

13    And that's evidenced by the First Amended Complaint, which

14  was the operative complaint at the time the agreement was

15  negotiated and entered into, and that complaint alleges only

16  Pixel-related disclosures.

17    So, and I you want to respond to Mr. Hammond's assertion

18  that the allegations in our Complaint don't adequately

19  demonstrate that the actual video information was being

20  disclosed to third parties.  The data card attached to the

21  complaint in the *Feller* case -- and this is ECF 1-3 in the

22  *Feller* action.

23    And, again, we've done over 100 of these cases involving

24  the exact types of disclosures at issue here.  Very similar

25  data cards.  We know how to read these data cards.

1    One of the selects on this data card is product.  Okay?

2    That means that the actual product titles were being rented and

3    disclosed to data appenders and being sent to data

4    cooperatives.  And discovery in the *Feller* action, before it

5    was stayed, revealed that Epsilon, Wiland, Path2Response,

6    several companies that we have extensive experience litigating

7    cases involving were some of the recipients of this data.

8        Epsilon is a data appender.  Okay?  So Epsilon is the

9    company that the defendant, on a monthly basis or potentially a

10   bimonthly basis, would have been sending its entire database

11   to, to then add demographic information about each person.  And

12   that type of demographic information is reflected here in the

13   data card; such as, gender, income, lifestyle, select.  Then

14   they would have sent that back to the defendant to then rent

15   and to exchange with other third parties on the open data

16   brokerage market at a premium.

17       So that's what happened here.  The Hoang To plaintiff and

18   his counsel settled this case without any knowledge or

19   experience with these types of disclosures.  And he also

20   applied any justification for why -- for why he's discounting

21   the class's damages by 99.8 percent, because that's what

22   $1.75 million represents.  It represents a 99.8 percent

23   discount.

24       He cites to the arbitration provisions in the defendant's

25   terms of use, but we looked into that.  There was a bare

```
 1   unordained hyperlink at the base of the web page.  There was no
 2   assent to that by anybody who made a purchase on defendant's
 3   website.  There was no motion to compel arbitration that could
 4   be filed in this case.
 5        This was a rock solid case that we spent a lot of time
 6   developing, trying to do our level best to recover meaningful
 7   relief for class members, and we feel like we had the rug
 8   pulled out from under us here.
 9        And if you look at the timeline, as described even in the
10   defendant's own declaration, this is a textbook example of a
11   reverse option.  That's what happened here.
12        The defendant chose to negotiate -- the day after we
13   rejected the offer that was openly accepted, they turned to the
14   plaintiff's counsel in this case knowing -- and the plaintiff's
15   counsel in this case, importantly, at that point knew that just
16   two weeks later the defendant had a responsive pleading due.
17   Okay?  And they had indicated they were going to be moving --
18   or they suggested to them that they would be moving to dismiss
19   on first-to-file grounds.
20        So at the time the defendant went to the Hoang To
21   plaintiff's counsel to settle this case, the same value that we
22   rejected, the Hoang To plaintiff and his counsel were in an
23   extraordinarily weakened bargaining position because they were
24   -- they faced the prospect of either settling the case now on
25   any terms and getting some -- getting paid at the end of it if
```

1    it was approved or recovering nothing and having their case

2    dismissed.  And so that's why this was such a collusive

3    scenario.

4         THE COURT:  Okay.  Let me draw you back to the issue

5    that I'm most interested in, which is valuing the claims.

6         In the To case they argued that the defendant didn't have

7    the records to determine whether data brokers accessed data

8    that allow them to identify specific persons purchasing the

9    specific videos.

10        So in the VPPA cases, how do you prove up the claim?  If

11   that's true, how do you prove up the claim?

12        MR. HEDIN:  So we dealt with a number of situations

13   in other cases, exactly the same types of disclosures here,

14   where the defendant claims they don't have the records

15   reflecting disclosures.

16        But you have to remember for every disclosure, there's a

17   party on the receiving end.  And so that's why we issued five

18   third-party subpoenas, before our case was stayed, to these

19   relevant data companies to get the data from them, showing the

20   transmissions, showing the -- actually getting the transmission

21   files.

22        We've obtained this type of data in well over 50 other

23   cases.  We weren't able to get the actual underlying records in

24   this case before the case was stayed, but we're confident that

25   if we were able to move forward, we would be able to get that

```
 1    information.
 2        And we think part of the impetus here on the part of the
 3    defendant to settle so quickly was to avoid us from getting
 4    that type of discovery.
 5            THE COURT:  Let me ask a separate question.  In your
 6    case you sued Alliance Entertainment --
 7            MR. HEDIN:  Yes.
 8            THE COURT:  -- which isn't a party.
 9        What impact does that -- would that have in terms of
10    anything, recovery or anything else that matters?
11            MR. HEDIN:  The reason we sued Alliance
12    Entertainment -- we understand that Alliance Entertainment
13    doesn't operate the websites, the consumer-facing websites, but
14    Alliance Entertainment is the company that's identified on the
15    data cards themselves.
16        So I'm looking at the one attached to the *Feller*
17    complaint.  It's titled "Alliance Entertainment Music and DVD
18    Master File Mailing List."  Alliance Entertainment is the
19    parent company and -- and based upon the data cards, it appears
20    that they were the ones transmitting this data on behalf of not
21    only, you know -- of all the websites that were owned by
22    subsidiaries, including the DirectToU defendant.  And so that's
23    why we named both, both of those companies.
24            THE COURT:  Okay.  All right.  Mr. Griswold, you may
25    not want to weigh in on the -- what I have been asking about,
```

```
 1   and certainly on the appropriate valuation of the claims, but

 2   any information that you have or any perspective that you have,

 3   I would be happy to listen to.

 4        MR. GRISWOLD:   Thanks, Your Honor.

 5        Your Honor, I think these VPPA cases are a little

 6   interesting when it comes to the settlement because it

 7   oftentimes involves virtually everyone I'm aware of

 8   overshooting what -- who the settlement class is going to

 9   consist of.  Because we don't know oftentimes who actually had

10   information that could be construed to be PII under the VPPA

11   disposed to a third party.  This case is really no different in

12   that sense.

13        With regards to the Pixel aspect of it, we don't know.  We

14   don't know, for instance, which users are purchasers of videos,

15   accessed the website, made a purchase while having a Facebook

16   account for which they provided real identifying information

17   that's part of their account and on which they accessed the

18   website on a browser that the user chose to allow cookies to be

19   transmitted on.

20        Those are all very specific kind of person-by-person

21   inquiries that -- that we don't have any insight to as, you

22   know, the owners of the website.

23        And it does involve third-party discovery.  Candidly, I

24   don't even know if Meta would even have that information in

25   terms of to whom it was disclosed.
```

```
 1            And then on the Brokerage side, Your Honor, again, this is
 2     a situation where it wasn't like my understanding is that
 3     DirectToU wasn't actually like mailing out lists, but they were
 4     maintaining different -- basically different lists on their
 5     server that could be accessed by different data brokerages and
 6     they could choose which dataset they wanted.  The names and
 7     the -- and the products were not sort of combined on a single
 8     list and I think mostly went to a specific order details list
 9     and chose:  I want to know who -- what was actually purchased.
10     What, you know, DVD was actually purchased.
11            This is really primarily for catalog people, Your Honor,
12     people who actually buy off catalogs.  My sense is that they
13     probably aren't too interested in what DVD somebody was buying
14     insofar as they were looking more for who -- who were buying
15     and recently and what were their mailing addresses so we can
16     send out the Christmas catalogs or whatnot.
17            We don't add insight in terms of what data brokerages were
18     actually accessing which pockets of information.  There is a
19     very good chance that nobody had any video information or order
20     details, you know, selected by the data brokerages.  That's
21     very -- that could very well be the case.  Same thing with the
22     Pixel as far as we know.
23            So there's an overshoot here in terms of who you include
24     in the settlement class.  And that's oftentimes why there's a
25     claims process.
```

```
 1        And I think one of the undercurrents here, Your Honor, is
 2   that I think -- these cases are generally pretty hard, I think,
 3   to certify.  There has only been one VPPA case that has gone
 4   the distance in terms of class certification of which I'm
 5   aware, and that would be the Univision case in South Florida.
 6   Judge Scola denied certification on a numerosity basis there.
 7   And they had actually received information from Meta in the
 8   course of, you know, briefing that out, but what they saw, at
 9   least, wasn't sufficient enough to show that even a
10   sufficiently numerous class could be considered that was
11   homogeneous for purposes of certification.
12        So I think it's -- I mean, look.  I -- about 15 years ago
13   I think I handled a VPPA case for a brick and mortar national
14   rental chain.  After I handled that one, I thought there's no
15   way I'm going to see this statute again.  Now it's clogging up
16   space in my brain.  And here we are 15 years later kind of
17   trying to fit what is really kind of an imperfect statute into
18   this digital world where you can tell we don't have a neat
19   class to identify.  And there's also other issues where we're
20   in a kind of uncertain area of the law right now, Your Honor.
21        I'm just -- I will also just mention that we did -- we did
22   share, you know, that we have other litigation going on.
23   DirectToU is not, believe it or not, killing it right now.
24   They are a DVD sales company.  They have other litigation going
25   on.  They have a singular insurance policy that's covering both
```

1    this litigation and the other litigation that they have going

2    on in Minnesota.

3        So there are, you know, some limited resources there.  And

4    obviously we would prefer not to pay anything in these cases,

5    but there's a -- you know, we would, I guess -- you know, Your

6    Honor, we would support, obviously, approval of a settlement

7    that we entered into and we would love to try to, you know,

8    complete that process.

9        **THE COURT:**  You know, Mr. Hammond, I'm going to go

10   back to you, but it does -- everybody's comments makes me think

11   that some discovery, which is true in many cases, might shed

12   light on these sort of uncertain issues.

13       But anyway, Mr. Hammond, why don't you -- please respond

14   to what Mr. Hedin had to say and then anything else.

15       **MR. HAMMOND:**  A few comments just on the issues which

16   he raised just in terms of collusion.  There was no collusion.

17       And I want to point out, Your Honor, that we have retained

18   an expert and we had retained an expert very early on.  We

19   identified several Pixels.  We negotiated the removal of the

20   Pixels from the website.

21       And we have done some -- some discovery on the issues of

22   the data brokerage cases, but I can't say to you here that

23   doing discovery wouldn't potentially elicit information that

24   would be very helpful.

25       Leaving that aside, I still would encourage Your Honor to

 1  preliminarily approve the deal.  I think it's an excellent

 2  result given the -- given where the dollar amount of these

 3  Pixel cases in terms of comparator cases falls within the

 4  arbitration agreement and the -- and given the -- some of the

 5  financial constraints the defendant is -- is under.

 6      But if Your Honor is to -- inclined to deny preliminary

 7  approval at this time would -- both with issue, discovery, and

 8  seek to -- seek to further elicit facts regarding the data

 9  brokerage case, the data brokerage issues.

10      THE COURT:  I don't quite know exactly what I should

11  do.  I don't know where the -- given the financial

12  circumstances to which Mr. Griswold alluded, I don't know how

13  real that -- how you each have evaluated an issue like that.

14      It does seem to me that it was -- might make sense for you

15  all to join together and look again.  I don't know how far -- I

16  can't ask and I don't -- I do want to know, but you should not

17  tell me where your mediation was headed.  What the response to

18  the -- that was rejected, where you were going to go next.  How

19  far off this really is in the plaintiff's view.  I don't know

20  any of those things and I may just decide to go ahead

21  because -- because I don't have -- because it's not obvious to

22  me that this isn't a reasonable settlement.

23      The -- let me just ask a couple of other questions.  With

24  respect to the injunctive relief aspect, Mr. Hammond, has --

25  can you tell me whether the defendant has removed the customer

```
1   data from and doesn't allow access to data by Epsilon, Wiland,

2   Data Axle and Path2Response?

3           MR. HAMMOND:  We have -- we have had discussions with

4   defense counsel.  They've said the data base has now been

5   switched off and so there's no access to the civil -- to the

6   access -- to the database by the civil data brokers.

7           THE COURT:  I do think that the release here is too

8   broad, and I think I would strike, if I approved this, the

9   "arising out of" language and insert "based."  And I think I

10  would strike "unaccrued" from it.

11      I don't think that the longer statute of limitations for

12  the UCL claim would make a difference for the -- and treat the

13  nationwide class unfairly.  It's still a pro rata claims rate.

14      I think for the notice itself I would use the higher

15  recovery amount, the $80 amount, or a range that included that

16  in order to encourage claims.

17      I wouldn't used term "vouchers" and I would include a URL.

18  But I'm really thinking about -- about valuation.

19      I take it, Mr. Hammond, that you have not had the VPPA

20  claims before; is that right?

21          MR. HAMMOND:  In other cases?

22          THE COURT:  Yeah.

23          MR. HAMMOND:  No.  We've got seven -- seven cases

24  right now, seven VPPA cases and several Pixel cases.

25      As I said, it -- we've got a Pixel case that's for final
```

1  approval with Judge Chhabria for $24 million against Tax Act,

2  and that's final approval tomorrow.

3      We've had several large settlements, Pixel settlements as

4  well, and which -- which have been recently settled but not

5  public knowledge yet.

6          THE COURT:  Why hadn't you included the VPPA claims

7  in the First Amended Complaint?

8          MR. HAMMOND:  In terms -- you mean, the data

9  brokerage?

10          THE COURT:  Yeah.

11          MR. HAMMOND:  The data brokerage claims?

12      We thought, in essence, that the -- that the Pixel -- the

13  Pixel cases would cover the same conduct.  It was just -- it

14  was a -- it's -- whether you disclose -- disclose PII through

15  the Pixel or through a data brokerage, there's -- from our

16  perspective, there's little difference.

17          THE COURT:  Mr. Hedin, I'll give you a shot at all of

18  this.  Anything you want to tell me before I close things up?

19          MR. HEDIN:  Thanks, Judge.

20      So we think the reason why they didn't include the data

21  brokerage disclosures in the Complaint is because they simply

22  didn't know about the data brokerage disclosures at the time

23  they wrote that and at the time they settled.

24      In terms of the injunctive relief, so after we filed this

25  case, we were monitoring the data cards.  They deleted the data

 1    cards on all the sites.

 2        And while Mr. Hammond says that he's had discussions with

 3    defense counsel in which they have said they won't continue

 4    sharing data, it doesn't appear there's any actual term in the

 5    agreement requiring that.  So we don't believe that is

 6    adequate.

 7        The California class members -- so on the California

 8    versus nationwide issue, I do think this is worth taking a

 9    second look at.  People in California who made purchases in the

10    last four years are getting paid, whereas everyone else in the

11    country is only getting paid for -- if they made a purchase in

12    the last two years.  That's because the VPPA statute of

13    limitations is two years.  The UCL, the -- there is no --

14    there's no claim for monetary relief being sought in the UCL

15    claim and so there is no basis to allow California class

16    members who made purchases more than two years ago to recover

17    the same amount as everyone else who made purchases during the

18    limitation period applicable to the VPPA claim, which is the

19    only claim for relief for damages.

20        And so by paying those people, what's happening is the

21    claims of class members who are entitled to relief are being

22    diluted.  We think that's unfair.  It should be fixed.

23        So, and then one last point.  I -- in terms of the release

24    provisions, I -- I don't believe the Court is able to rewrite

25    those provisions.  I believe the Court either has to approve or

deny the settlement in full.  But I do obviously share the
Court's concerns concerning the breadth of those release
provisions, and we believe approval should be denied on that
basis alone.

In terms of the mediation privilege issue that the
defendant raised in their reply to our opposition, we haven't
had a chance to brief this issue, and we're happy to provide
supplemental briefing if the Court thinks it would be helpful.
But we strongly believe that there is no mediation privilege
applicable here.  There is no federal common law mediation
privilege.  This is a federal claim.  The mediation had already
ended over a week before these -- these offers were made, so --
and there was no second mediation scheduled.

But even if there were a privilege that otherwise applied,
in this case the defendant has made several filings in which
they assert that the proposed settlement was entered into at
arm's length in a non-collusive basis.  They go into detail
about what information was and was not shared with the
respective parties in their settlement discussions.

We think this is a clear case of them having waived the
right to assert mediation privilege to the issue of the
collusiveness or the non-collusiveness of the proposed
settlement.

And we also think that in the class action context, there
has to be more transparency in regards to the process, as well

1 as the substance, but including the process in which a deal is

2 negotiated, especially given the circumstances that gave rise

3 to this deal here.

4    **THE COURT:**  All right.  Any last word from anybody

5 else?

6    **MR. HAMMOND:**  Not from plaintiff.

7    **MR. GRISWOLD:**  Your Honor, defendant did not waive

8 any mediation privilege.  In over 20 years this is the first

9 time I've seen any counsel file the amounts exchanged during

10 mediation process, whether it was through the mediator or

11 during the mediation or immediately afterwards.

12  So I -- I do believe the mediation agreement was breached

13 here.  And I don't think it should be -- those statements

14 should be considered as part of the consideration on the

15 preliminary approval.

16  I also think, Your Honor, that -- I disagree with

17 Mr. Hedin in terms of Your Honor's discretion when it comes to

18 preliminary approval.  I think Courts regularly look at the

19 terms of the Settlement Agreement and ask the parties to

20 address the Court's concerns.

21  I know we're willing to do so here and I would ask Your

22 Honor to exercise its discretion and allow us the opportunity

23 to address those concerns.

24  Thank you.

25    **THE COURT:**  All right.  Well, thank you for your

1    argument and I will do some more thinking about what I should

2    do.

3         Thanks a lot.

4         (Proceedings adjourned.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

### <u>CERTIFICATE OF OFFICIAL REPORTER</u>

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Monday, January 27, 2025

# EXHIBIT B

Pages 1 - 8

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Orrick, Judge

```
JONATHAN HOANG TO,             )
individually and on behalf of  )
all others similarly situated, )
                               )
          Plaintiffs,          )
                               )
  VS.                          )    NO. C 24-06447 WHO
                               )
DIRECTTOU, LLC,                )
                               )
          Defendant.           )
_____)
```

San Francisco, California
Tuesday, February 4, 2025

<u>**TRANSCRIPT OF VIDEOCONFERENCE PROCEEDINGS**</u>

<u>**APPEARANCES**</u>:  (via videoconference)

For Plaintiffs:

        HAMMOND LAW P.C.
        1201 Pacific Avenue - Sixth Floor
        Tacoma, Washington  98402
    BY:  **JULIAN A. HAMMOND, ATTORNEY AT LAW**
        **POLINA BRANDLER, ATTORNEY AT LAW**

        HEDIN LLP
        1395 Brickell Avenue - Suite 610
        Miami, Florida  33131
    BY:  **FRANK S. HEDIN, ATTORNEY AT LAW**

For Defendant:

        BAKER HOSTETLER LLP
        One North Wacker Drive - Suite 3700
        Chicago, Illinois  60606
    BY:  **JOEL C. GRISWOLD, ATTORNEY AT LAW**

Remotely Reported:  Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
        U.S. District Court - Official Reporter

**Tuesday - February 4, 2025**                              **2:19 p.m.**

**P R O C E E D I N G S**

**---oOo---**

    **THE CLERK:**  We will get under way then in case number 24-6447, Hoang To versus DirectToU, LLC.

    Counsel, if you would please state your appearance for the record.

    **MR. HAMMOND:**  Julian Hammond and my colleague Polina Brandler for Hammond Law for the putative class.

    **MR. HEDIN:**  Good afternoon, Your Honor, Frank Hedin on behalf of the Plaintiffs in the related filler action in the Southern District of Florida.

    **MR. GRISWOLD:**  Good afternoon, Your Honor, Joel Griswold for the Defendant DirectToU.

    **THE COURT:**  Great.  Good afternoon to you all.

    So, Mr. Hedin, what's your perspective on this case at the moment?  Is it I'm going to be dealing with a motion from the Defendants.  I have got -- that is a motion to transfer, among other things.  I have got a firm belief that one court or the other ought to be dealing with this and not both of us.  What's your perspective on where the case ought to be?

    **MR. HEDIN:**  Your Honor, my perspective is that the Court has already resolved the motion that the Defendant just filed.  It declined to transfer the case previously to the Southern District of Florida.  Since that time it's spent

considerable resources resolving the motion for preliminary

approval and taking a deep dive into the legal and factual

issues in the case.  So, we think this Court is best equipped

to preside over this matter going forward.

        **THE COURT:**  Thank you.  I appreciate that.

    Mr. Griswold, I haven't looked at the motion, so I

don't -- I'm not making a preemptive ruling.  If it was only on

the first filed -- if the basis was only on the first filed

motion, you would have a very steep hill to climb, I think,

because I have thought about that; but I haven't looked at it

so -- but what I am sure is that the case ought to be in one

place and that whichever place it is in, there's going to need

to be a different complaint than what has -- has previously

been filed.

    So, what I'm inclined to do is now grant leave to amend to

file a third amended complaint and get this case moving.  So,

that's my perspective.  What's yours, Mr. Griswold.

        **MR. GRISWOLD:**  Your Honor, I think the only reason

this case was placed ahead or leap frogged ahead of the Florida

case was because we had reached what we believed was a

settlement.  And obviously the denial of preliminary approval

really put us in a position where we're actually behind the

Florida case in terms of what's been done; right.

    Discovery is already served and responded to in the

Florida case.  The motion to dismiss was already filed by us.

1    We were actually moving ahead in that case.  Third party

2    discovery had already gone out.  In fact, the Florida case only

3    put their case on pause because of the settlement that was

4    reached in California.

5        And obviously with the curveball and then having it

6    denied, we are really behind Florida, I guess, substantively in

7    terms of the amount of work that has been done and litigating

8    the case.

9        No discovery has been served here.  The parties, you know,

10   were in settlement mode.  We weren't in litigation mode.  That

11   has since changed.  And, you know, Plaintiffs have both been

12   invited to participate in a mediation.  They rejected that.

13   They want to engage in discovery.  We think it is improper

14   until we have the motion to transfer or dismiss this case

15   decided and, frankly, until we have had an opportunity to

16   respond to whatever the operative complaint would be.

17       And Your Honor seems inclined to grant a leave to file, I

18   think, a third amended complaint adding, I guess, additional

19   parties -- both Plaintiffs and Defendants -- and who knows what

20   allegations will -- we would like an opportunity obviously to

21   see what that looks like and file an appropriate response.

22   Whether that is a motion to compel arbitration or whether

23   that's, you know, some kind of other (b)(6) or (b)(1) type of

24   motion, we will have to see.

25       Your Honor, I think -- and in any event, these cases

1  probably don't proceed as a class just because, you know, there

2  are individual arbitration that would apply to any putative

3  class members.

4        **THE COURT:**  Okay.  And so I -- thank you.  I -- I

5  assume you agree that one court or the other ought to have

6  this; correct?

7        **MR. GRISWOLD:**  At the outset, yeah.  I mean, I'm again

8  reserving all defenses in terms of whether any court should

9  have it.  Yes, it should be in one court or the other to make

10  these decisions; correct.

11        **THE COURT:**  So, Mr. Hammond, and, Mr. Hedin, you were,

12  according to the CMC, working together.  How quickly can you

13  get the third amended complaint on file?

14        **MR. HAMMOND:**  Towards the end of the week, Your Honor,

15  or the first few days of next week.

16        **THE COURT:**  Okay.  So, I would go ahead and get that

17  done.  I will take a look at the motion -- the Defense motion

18  when it is briefed and make a ruling in accordance with that.

19        Judge Ruiz has got the jump on me in staying his case,

20  but -- but I will -- I will try and analyze this as best I can

21  and make a determination; but one way or the other, you are

22  going to have -- you are going to want that amended complaint.

23  So, I don't think it's wasting anybody's time.

24        And then I guess what we will do is set a -- I don't know.

25  I guess I will wait on a CMC until I have seen the -- whatever

1   responsive pleading Mr. Griswold files on behalf of his

2   clients.

3       If there's some -- a basis -- I don't think I can set a

4   decent schedule until I know a little bit more about what the

5   shape of the case is going to look like.

6       So, let's -- let's get the third amended complaint on

7   file, and we will have a CMC as soon as there is clarity on

8   that; okay.

9           **MR. HAMMOND:**  Thank you, Your Honor.

10          **THE COURT:**  Is there anything else, Mr. Hammond, or,

11  Mr. Hedin, that you think would be useful today or,

12  Ms. Brandler, for that matter.

13          **MR. HAMMOND:**  I would just urge the Court to open up

14  discovery now.  The -- in terms of where the case stands is

15  now, I think it is appropriate that discovery is opened.  In

16  your ruling upon preliminary approval, you pressed us to not be

17  mere speculative on the question of the data brokers; and we

18  had some informal discovery and we sought out a stipulation

19  from the Defendant to do some limited discovery on the data

20  brokers.  And we are in a position where the information from

21  the data brokers is essential to the case, and it -- we want to

22  ensure that it is preserved, which to that extent we sent out

23  preservation letters.

24      The sooner we are allowed to send out third-party

25  discovery, the -- the -- the -- then we are in a position that

1  the data can be protected; and we will be able to have a real

2  meaningful discussion.

3       To that extent, you know, it was raised by Defense Counsel

4  whether or not we would agree to go to a -- magistrate judge to

5  further settlement discussions.  We -- we were agreeable to

6  that subject to having some formal discovery, which -- and we

7  are still at that position.  So, subject to having some formal

8  discovery on that -- on the question of the information from

9  the data brokers, we are open to that.

10      And so, if there's one suggestion that I would -- that I

11 would ask Your Honor to consider would be to open up discovery

12 so we can send out the third party discovery to the data

13 brokers at this stage.

14      **THE COURT:**  I think I want to get -- understand where

15 this case is going.  I did want you to do discovery -- limited

16 discovery because I thought you were in a position to resolve

17 the case.  You haven't.  So, I don't think -- I don't see great

18 prejudice in waiting.  If you are going to be able to file

19 within the week, we will have a hearing within about six weeks

20 and/or -- I guess that's not true but within 8 or 9 weeks --

21 so, I think that should be sufficient; and I would like to see

22 what the -- what the Defense is going to be raising in

23 opposition.

24      **MR. HAMMOND:**  Thank you, Your Honor.

25      **THE COURT:**  Okay.  Mr. Griswold, anything on your

1  mind?

2      **MR. GRISWOLD:**  No, Your Honor, not at the moment.

3  Thank you.

4      **THE COURT:**  Okay.  All right.  Thank you all.  Let's

5  proceed.

6      **MR. HAMMOND:**  Thank you.

7      **MR. HEDIN:**  Thank you.

8      **MR. GRISWOLD:**  Thank you.

9      **THE CLERK:**  That concludes our calendar for this

10  afternoon.  Thank you all.

11              (Proceedings adjourned at 2:29 p.m.)

12                      ---oOo---

13

14

15

16

17

18

19

20

21

22

23

24

25

1
2
3          **CERTIFICATE OF REPORTER**
4          I certify that the foregoing is a correct transcript
5    from the record of proceedings in the above-entitled matter.
6
7    DATE:    February 20, 2025
8
9
10
11    _____
12          Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
            United States District Court - Official Reporter
13
14
15
16
17
18
19
20
21
22
23
24
25