JULIAN HAMMOND (SBN 268489)
jhammond@hammondlawpc.com
POLINA BRANDLER (SBN 269086)
pbrandler@hammondlawpc.com
ARI CHERNIAK (SBN 290071)
acherniak@hammondlawpc.com
HAMMONDLAW, P.C.
1201 Pacific Ave, 6th Floor
Tacoma, WA 98402
Tel. (310) 601-6766
Fax (310) 295-2385

FRANK S. HEDIN (SBN 291289)
fhedin@hedinllp.com
HEDIN LLP
1395 Brickell Ave, Suite 610
Miami, Florida 33131
(305) 357-2107 (Office)
(305) 200-8801 (Fax)

*Attorneys for Plaintiff and the Putative Class*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **JONATHAN HOANG TO**; **JEFFRY HEISE**; and **JOSEPH MULL**, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>**DIRECTTOU, LLC**, a Delaware Limited Liability Company; and **ALLIANCE ENTERTAINMENT, LLC**, a Delaware Limited Liability Company,<br><br>Defendants. | Case No. 3:24-CV-06447-WHO<br><br>**DECLARATION OF JULIAN HAMMOND IN SUPPORT OF PLAINTIFFS' NOTICE OF SECOND MOTION AND SECOND MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>Judge: Hon. William H. Orrick<br>Courtroom: 2<br>Hearing Date: September 17, 2025<br>Hearing Time: 2:00 p.m. |

I, Julian Hammond, declare as follows:

1. I am a member in good standing of the Bar of the State of California and counsel of record for the Plaintiffs in the above-captioned matter and the putative Settlement Class. I make this declaration based on personal knowledge and, if called as a witness, I could and would testify competently to the matters set forth herein.

2. I submit this declaration in support of Plaintiffs' Second Motion for Preliminary Approval of the Class Action Settlement. A true and correct copy of the Settlement Agreement, which has been executed by the parties, is attached hereto as **Exhibit 1**. Attached as exhibits to the Settlement Agreement are the following documents:

- Exhibit A – Claim Form
- Exhibit B – Email Notice
- Exhibit C – Long-Form (Settlement Website) Notice
- Exhibit D – Proposed Preliminary Approval Order
- Exhibit E – Proposed Final Approval Order

**I. INTRODUCTION**

3. Plaintiffs have achieved an impressive result in this case despite significant litigation risks, including the risk – realized one day after the parties agreed to the proposed Settlement – of having their claims compelled to individual arbitration; the risk of denial of class certification; and the risks on the merits arising from new developments in the law and Defendants' arguments, including that users consented to the challenged practices, that customers' personal information was not actually disclosed, and that the putative class members suffered no actual damages.

4. Defendants have agreed to pay $1,577,000 to resolve this action and to non-monetary relief designed to ensure that Defendants cease the challenged practices.

5. The $1,577,000 cash settlement, after deduction of Court-approved attorneys' fees and costs, administration expenses, and service award, will be allocated pro rata to all Class Members who

submit a valid Claim Form.[1] The cash settlement represents an average per-Class Member monetary settlement of $5.42 gross and $3.53 net and, assuming a 5% claims rate anticipated by the Plaintiffs and the proposed Settlement Administrator, the average recovery per Settlement Class Member who submits a claim will be $108.35 gross, and $70.60 net. This represents significant monetary relief for Settlement Class Members, and is well above the average recovered in comparable cases.

6. In agreeing to prospective non-monetary relief, Defendants have agreed to modify the Meta pixel settings and have committed to not disclose customers' information, except as permitted under the VPPA and Cal. Civ. Code § 1799.3, and *to remain bound by these obligations*, unless these laws are amended, repealed, or invalidated. Defendants' agreement to cease the challenged practices will benefit all current and future consumers.

7. In light of the Court's recent order compelling Plaintiffs to individual arbitration, it is clear that, absent this Settlement, class relief would have been precluded. Class Members would have been required to pursue their claims in arbitration, which is a risky and cost-prohibitive process, which few, if any, would have proceeded with and from which they risked recovering nothing. Plaintiffs' counsel considers this Settlement to be overall an excellent result.

## II.   SUMMARY OF THE LITIGATION

8. On August 12, 2024, Plaintiff Hoang To filed this putative class action lawsuit in Alameda County Superior Court, alleging, on behalf of Plaintiff and a putative class of California consumers, that Defendant DirectToU violated the VPPA and Cal. Business & Professions Code § 17200 et seq. ("UCL") by disclosing its customers' personally identifying information ("PII") through the Meta pixel. Defendant DirectToU removed the case to this Court on September 12, 2024 and Plaintiff Hoang To subsequently filed a First Amended Complaint which added a putative nationwide class with a California subclass. On

---

[1] The use of the Claim Form makes it more likely that a greater proportion of the settlement funds distributed will actually be received and redeemed by the Class Members. And, the use of the Claim Form allows the use of electronic payments (through selection of electronic payment and provision of required information for e-payment on the Claim Form), which will likely help reduce fraud in the receipt of settlement funds through the mail and allow for means of distribution that are less expensive than printing and mailing a physical check.

1  October 23, 2024, the Plaintiff Hoang To and Defendant DirectToU executed a Class Action Settlement Agreement.

9. On October 28, 2024, Counsel for Plaintiffs in *Feller, et al. v. Alliance Entertainment, LLC, et al.*, No. 24-cv-61444-RAR (S.D. Fla.), filed a Motion to Intervene and to dismiss, stay, or transfer the instant case to the Southern District of Florida pursuant to the first-to-file doctrine.

10. On December 4, 2024, the Court heard the *Feller* Plaintiffs' motion to intervene and dismiss, and Plaintiff Hoang To's motion for preliminary approval of the class action settlement. Following the hearing, the Court denied both motions. In denying the motion for preliminary approval without prejudice, the Court "encourage[d] all counsel – for the parties and for *Feller* – to meet and confer to determine if a revised global settlement can be reached that appropriately accounts for the non-Meta pixel claims," or alternatively to submit "a renewed motion for preliminary approval that provides a reasoned valuation for the non-Meta pixel claims and additional support demonstrating that the existing settlement was reached after sufficient discovery, all showing why the settlement is fair, reasonable, and adequate."

11. Counsel for Plaintiff Hoang to and the *Feller* Plaintiffs subsequently agreed to jointly prosecute this litigation on behalf of the proposed Classes.

12. Pursuant to the Court's Order, Plaintiff Hoang To met and conferred with Defendant DirectToU regarding valuation of its alleged disclosure of Class Members PII to non-Meta data brokers, and Defendant produced confidential informal discovery exclusive for settlement discussions relevant to the data brokerage claims. The information provided confirmed that there was no way to directly connect the information provided to the data broker with the identity of the consumer. And, a link could be made only if data was combined and reverse engineered. While Plaintiffs sought additional discovery in order to create a more robust record for settlement, settlement negotiations broke down.

13. On February 7, 2025, Plaintiffs filed the operative Third Amended Complaint, adding two of three *Feller* plaintiffs as named plaintiffs in this case, adding Alliance Entertainment, LLC (a defendant in the *Feller* Action along with DirectToU) as a named Defendant, and added additional factual allegations in support of the existing causes of action. Promptly following the filing of the Third Amended

Complaint, the *Feller* plaintiffs filed a notice of dismissal in the Feller Action pursuant to Federal Rule of Civil Procedure 41(a)(1).

14. On March 10, 2025, Defendants filed a motion to compel Plaintiffs to individual arbitration, along with supporting declarations and evidence. On April 7, 2025, Plaintiffs filed a response in opposition to the motion, along with supporting declarations and evidence, and on April 28, 2025, Defendants filed a reply along with a supporting declaration.

15. On June 4, 2025, the Court held a hearing on Defendants' motion to compel arbitration. Based on the Court's questions and statements during oral argument, Plaintiffs' counsel concluded that the Court was likely to grant the motion in the near future.

16. Plaintiffs' counsel recognized the risks Plaintiffs and the Class would face if the Court granted Defendants' motion, and on June 5, 2025, contacted Defendant's counsel to explore whether a potential settlement could be reached. After further discussions that followed over the next week, the parties, through their respective counsel, reached an agreement, by e-mail on June 12, 2025, on all material terms of the Settlement presently before the Court for approval.

17. On June 13, 2025, as the parties were working to finalize a notice of settlement to file on the docket, the Court issued an Order granting Defendants' motion to compel arbitration in its entirety and stayed the case.

18. Following the Court's Order compelling arbitration, the parties executed the formal Settlement Agreement and Plaintiffs' counsel prepared the instant Motion.

**III.    SUMMARY OF RESEARCH, INVESTIGATION, AND INFORMAL DISCOVERY BEFORE AND AFTER THE FIRST MOTION FOR PRELIMINARY APPROVAL**

19. Prior to filing the *Hoang To* lawsuit, my firm conducted extensive independent investigation into the factual and legal basis of this lawsuit, and we continued to investigate the case, including through obtaining data and information from Defendant as part of informal discovery.

20. Specifically, prior to filing the *Hoang To* lawsuit, my firm spent many hours thoroughly researching and considering the relevant facts and law. We analyzed Defendant's websites (www.deepdiscount.com, www.ccvideo.com, www.moviesunlimited.com) for presence of tracking tools,

reviewed the steps consumers were required to take to sign up for an account with Defendants and/or make purchases, as well as other information available on Defendants' websites. We also reviewed information provided by Plaintiff Hoang To about his purchases and reviewed changes to Defendant DirecToU's website over time including changes to Defendant's Terms of Use and Privacy Policy and changes to how the Facebook/Meta Pixel was configured throughout the relevant period, by reviewing historic versions of the website available on the internet archive known as the "Wayback Machine." We analyzed dozens of orders on motions to dismiss and summary judgment motions in VPPA cases both in and outside this district.

21. We subsequently retained an expert to confirm our findings concerning the presence of tracking tools on Defendant DirectToU's website and the configuration of the tracking tools. The expert also prepared HAR files that evidenced the sharing of Defendant's customers' DVD and Blu-ray purchase data with Meta.

22. Finally, we obtained key information and data as part of informal discovery, including the size of the national Class and the California subclass, information about when the pixel was first installed on Defendant's websites.

23. After obtaining agreement from Defendant DirectToU, as part of settlement negotiations in connection with the first Settlement Agreement, to remove all tracking tools, including the Facebook Pixel and the Facebook like button from its websites (www.deepdiscount.com, www.ccvideo.com, www.moviesunlimited.com), we directed the expert to test Defendants' websites to confirm that Defendants had removed tracking tools. The expert confirmed that Defendants had removed both the Meta Pixel and the Facebook like button from their websites. Plaintiffs also ascertained through confirmatory discovery that the lists containing Defendants' customer information had been removed from www.nextmark.com and is not available to any data brokers.

24. On December 4, 2024, the Court denied Plaintiff Hoang To's Motion for Preliminary Approval. Following that order, Plaintiff Hoang To obtained from Defendants additional confidential informal discovery exclusively for settlement discussions relevant to the data brokerage claims. This discovery showed that Defendants maintained four or five spreadsheets with consumer data that data

brokers could access, but no single spreadsheet contained information that could be used to match a particular consumer to the video title he/she purchased. And, a link could be made only if data was combined and reverse engineered. While Plaintiffs sought additional discovery in order to create a more robust record for settlement, from the discovery received it was clear that there was no way to directly connect the information provided to the data broker with the identity of the consumer.

## V. THE STRENGTH AND RISKS OF PLAINTIFFS' CASE

25. Plaintiffs believe their claims have merit and they would prevail at trial. Nevertheless, Plaintiffs acknowledge a number of risks, including the risk of individual arbitration – a risk which materialized in this case; the risk of losing on class certification; the risk of losing on the merits; the risk that the Court would find that, pursuant to Defendants' Terms of Use, Class Members were entitled to no more than what they actually paid to Defendant and/or that the Court would find that statutory damages are discretionary and reduce them in the exercise of its discretion.

### 1. <u>Defendants' Major Defenses</u>

#### a. *Arbitration Risk*

26. On June 4, 2025, the Court held a hearing on Defendants' motion to compel arbitration, which left Plaintiffs' counsel with the strong impression that the Court intended to grant Defendants' motion. An order from this Court compelling Plaintiffs to individual arbitration would bar class relief and would require Plaintiffs and Class Members to pursue their claims in individual arbitration. They would thus face prohibitive expense of individual arbitrations and substantial risk, including the possibility of adverse rulings with limited appeal and invasive discovery such as forensic imaging of their devices.

27. This risk materialized quickly: on June 13, 2025, the Court issued its order compelling Plaintiffs to arbitration on an individual basis.

28. Had Plaintiffs' counsel not acted swiftly to negotiate the proposed Settlement following the June 4 hearing and before the Court's issuance of the Order compelling Plaintiffs to arbitration on June 13, class recovery would be barred.

///

///

### b. Risk of Recovery Being Limited to Amounts Paid

29. Absent the Settlement, Plaintiffs would have faced a significant risk that the Court would enforce the damages limitation clause contained in the Terms of Use applicable to each of Defendants' websites. This clause purports to limit Plaintiffs' and Class Members' recovery to the purchase price of goods purchased by each respective Class Member from Defendants.

30. Plaintiffs believe that this provision would be found to be unconscionable (whether Plaintiffs' claims proceeded in court or in arbitration) because, if enforced, it would deprive Plaintiffs and other Class Members of their statutory rights. However, Plaintiffs recognize that this provision presents litigation risk in that, if Defendants successfully enforced this provision, it would dramatically reduce potential recovery.

### c. Risk of Losing on Class Certification

31. While Plaintiffs are confident that they would be able to certify the class, they are also keenly aware that if the settlement had not been reached, Defendants were prepared to present arguments that multiple individualized inquiries would preclude. For example, some customers may have used browsers and other tools which prohibited or limited the disclosure of their PII to Meta and other third parties. The ultimate outcome of a contested class certification motion would be uncertain. The risk of non-certification presents the same concerns as the risk of Plaintiffs' claims being compelled to individual arbitration in that class members would be highly unlikely to pursue individual relief.

### d. Risks of Losing on the Merits

32. There was also a risk that the Court would dismiss Plaintiffs' VPPA claim on the merits if it adopted the reasoning of the Second Circuit decision in *Solomon v. Flipps Media, Inc.*, 136 F.4th 41 (2d Cir. 2025), issued on May 1, 2025, while Defendants' motion to compel arbitration was pending. In *Solomon,* the Second Circuit held that a VPPA violation required that an ordinary person be able to identify a particular person as having viewed a particular video and that Plaintiffs failed to "plausibly allege that an ordinary person could identify [the plaintiff] through her FID," since an ordinary person would not see or figure out the meaning of the "c_user" cookie and the corresponding string of letters "and conclude that the phrase was a person's FID." *Solomon*, 136 F.4th at 54-55.

33. Defendants here could have argued that Plaintiffs' Complaint, which also allege that the "Meta Pixel automatically caused the Plaintiffs' and Defendants' other customers' personal identifiers, including IP addresses and the c_user, _fr, _and datr cookies, to be transmitted to Meta", does not plausibly allege that an ordinary person could identify plaintiffs through the Facebook ID. Dkt. 68, ¶ 38. Defendants would have contended that the Ninth Circuit has also adopted the "ordinary person" standard and Plaintiffs' claims should be dismissed. *See Eichenberger v. ESPN, Inc.,* 876 F.3d 979, 985 (9th Cir. 2017) (adopting ordinary person standard).

### 2. The Strength and Risks of Plaintiffs' VPPA Claim

34. Plaintiffs believe they would successfully establish that Defendants violated the VPPA by disclosing their information and the information of other Class Members that identified them "as having requested or obtained specific video materials or services" from Defendants, without their informed, written consent.

35. Defendants could argue, however, that Plaintiffs and Class Members consented to the disclosure of this information because they (purportedly) consent to Defendant's Privacy Policy at the same time they consent to Defendant's Terms of Use on one or more of Defendants' websites. But, Plaintiffs believe that Defendants' argument would fail because the VPPA sets out specific, detailed requirements for written consent including that: (1) the written consent must be "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer;" (2) "at the election of the consumer" the consent must be either be "given at the time the disclosure is sought" or "in advance for a set period of time, not to exceed 2 years or until consent is withdrawn by the consumer, whichever is sooner;" and (3) the video tape service provider must provide "an opportunity, in a clear and conspicuous manner, for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election." 18 U.S.C. § 2710(b)(2)(B)(i)-(iii).

36. Plaintiffs recognize, however, that Defendants' primary defense to the VPPA claim would focus on the potential difficulties Plaintiffs would encounter in establishing whether any specific Class Member's information was disclosed via tracking tools or was sold or otherwise disclosed to data brokers and other third parties. Plaintiffs' counsel believe that these difficulties would stem in part from the fact

that obtaining discovery from Meta, in their experience, would be challenging. And, Plaintiffs' counsel are mindful of the similar challenges faced when seeking to obtain information data brokers. Although Plaintiffs could overcome these challenges, they recognize them as posing substantive risk to recovery on their claim.

37. Based on all these risks, Plaintiffs' counsel evaluated Plaintiffs' claims for settlement as follows. Plaintiffs seek statutory damages of $2,500 per Class Member, pursuant to section 2710(c), for a total maximum exposure on this claim of $727,820,000 (291,128 Class Members x $2,500).

38. Plaintiffs expect that Defendants would contend that this figure would be subject to a due process challenge as disproportionate to the injury and goals of the statute. In addition, Defendants could argue that the damages under the VPPA are discretionary because the statute uses the word "may" in section 2710(c)(2)(A).

39. Based on the above, Plaintiffs believe that a fair estimate of recoverable damages could be based on the value of the personal data allegedly disclosed. Based on Plaintiffs' review of similar VPPA cases and U.S. consumer survey results that measures how consumers value their data, and a paper presented to PrivacyCon 2020 hosted by the Federal Trade Commission, Plaintiffs viewed the value of the data disclosed as around $5 per Class Member. A true and correct copy of "How Much is Privacy Worth Around the World and Across Platforms?", Jeffrey Prince, March 2020, is attached as **Exhibit 2**.

40. Even assuming recoverable damages of $20 per Class Member (four times that suggested by other cases and consumer surveys), Defendants' exposure is $5,822,560 (291,128 x $20). Plaintiffs recognizes that this more reasonable measure of damages ($5,822,560) is then subject to discounts for settlement purposes based on all the risks discussed above, including the risk of individual arbitration or losing on class certification, of recovery being limited to the amount paid to Defendants, and various other risks. Accordingly, Plaintiffs applied a 50% discount for these risks and thus estimated Defendants' realistic exposure on this claim at $2,911,280.

### 3. The Strength and Risks of Plaintiff Hoang To's Cal. Civil Code § 1799.3 Claim

41. Plaintiffs conducted similar analysis of Plaintiff Hoang To's Cal. Civ. Code § 1799.3 claim, as of the VPPA claim. The only difference is that Defendants have an additional potential defense

against Plaintiff's § 1799.3 claim, which is based on the statute's "willful violation" provision, as opposed to VPPA's lower level of scienter "knowing" disclosure provision.

42. Similarly to Plaintiffs' claim under the VPPA, the potentially total maximum exposure is massive. Pursuant to § 1799.3(c), for each willful violation, a Class Member can recover a civil penalty of $500. Even assuming that each Class Member can recover only $500 (rather than $500 for each purchase from Defendant or for each time his or her PII was disclosed), Defendant's theoretical exposure is $17,623,500 (35,247 California Subclass Members x $500). Plaintiff expects that Defendants would argue that this figure raises significant due process concerns. Thus, Plaintiff views a reasonable estimate of potential maximum damages as one that is based on at most $20 for each California sub-class Member, which results in maximum recovery of approximately $704,940 (35,247 California Subclass Members x $20).

43. The $704,940 exposure is subject to all risks of individual arbitration, the risk of non-certification and on the merits, and the risk of recovery being limited to the amounts paid by Class Members discussed above. Based on these risks, Plaintiff applied a 50% discount for settlement purposes and thus estimates Defendant's realistic exposure on this claim at $352,470.

44. In addition, a discount is warranted given the strength of the VPPA Claim and because the Court might not permit a substantial recovery under § 1799.3 as it is based on the same underlying conduct as Plaintiffs' VPPA claim and seek similar type of relief (a civil penalty that is akin to liquidated damages provided by the VPPA).[2] Thus, Plaintiffs consider Defendants' realistic aggregate exposure on all three claims to be similar to, and dependent on, Defendant's exposure to Plaintiffs' VPPA claim.

**VII.    RISK OF FURTHER LITIGATION**

45. The risks of further litigation are clearly evident. If this case had not settled when it did, the Class would recover nothing because the Court compelled Plaintiffs' claims to individual arbitration.

---

[2] Given that the UCL claim is derivate of Plaintiff Hoang To's other claims and given the strength of his main claims, Plaintiff thinks that his UCL claim would only entitle him to the same relief available under the underlying statutes but would allow him to extend the claims of California Subclass members back to four years prior to the filing of the Complaint (as opposed to two years for the nationwide Class). Accordingly, Plaintiff ascribes only *de minimus* monetary value to his UCL claim.

## VIII. THE SETTLEMENT REPRESENTS AN EXCELLENT RESULT

46. Defendant has agreed to pay $1,577,000 to settle claims of 291,128 Class Members (which includes 35,247 California Subclass Members). As discussed above, this represents gross per-Class Member recovery of approximately $5.42 and net recovery of approximately $3.53. Assuming a claims rate of 5%, the gross share of the cash settlement fund available to each Settlement Class Member submitting a valid claim will be approximately $108.34, and their net share of the cash settlement fund (after the payment of court-approved attorneys' fees and costs, Class Representative Service Award, and Settlement Administration Costs) will be $70.60. This recovery compares very favorably with the relief available to claimants in consumer actions in general and in VPPA settlements. In fact, the monetary relief in this case places this case toward the high end of the range of court-approved settlements in similar cases. *See* **Exhibit 3** attached hereto.

47. Although the operative pleading also alleges that Defendants disclosed Plaintiffs' and Class members' PII to other third parties on the data-brokerage marketplace—which would ordinarily justify a per-class-member recovery in excess of the per-head market rate for settlements in cases solely involving Meta Pixel disclosures—the circumstances of this case at the time of Settlement were far from ordinary. The Court denied the first motion for preliminary approval without prejudice. Following that denial, Defendant produced confidential informal discovery, exclusively for settlement discussions relevant to the data-brokerage claims, which confirmed there was no way to directly connect the information provided to the data broker with the identity of the consumer. Plaintiff Hoang To then sought further discovery, but the settlement subsequently fell apart. Based on the tone of the hearing on Defendants' motion to compel arbitration, Plaintiffs' counsel believed the Court was likely to grant the motion. With the motion to compel pending, Plaintiffs' counsel was able to negotiate a new Settlement Agreement.

48. In addition, the Settlement Agreement includes valuable prospective relief by requiring Defendants to refrain from engaging in the conduct that underlies Plaintiffs' claims in the instant case. This is similar to the non-monetary relief achieved in other VPPA settlements.

49. Plaintiffs' counsel believes that the combined monetary and prospective relief (an important part of which has already been implemented by the Defendant) represents an excellent result for the Class (and the California Subclass) and achieves important goals of this lawsuit. The result is particularly excellent given that Plaintiffs' claims rest on novel theories or unsettled areas of law and Plaintiffs faced several risks if litigation continued, including the risk of losing on class certification and/or on the merits.

### IX.  HAMMONDLAW'S EXPERIENCE

50. HammondLaw attorneys have extensive class action and complex litigation expertise. Our attorneys have consistently won unprecedented recoveries for consumers as well as employees, obtained crucial injunctive relief, caused changes in industry standards, and even caused the California Legislature to pass new legislation. HammondLaw is also currently pursuing several VPPA cases and are intimately familiar with issues involved in prosecuting VPPA claims and the range and nature of settlements reached in such cases. Their extensive experience and expertise were instrumental in securing the excellent result in this case. HammondLaw's firm resume is attached as **Exhibit 4** hereto. The qualifications of attorneys at Hedin LLP are discussed in the concurrently filed Declaration of Frank Hedin ("Hedin Decl.").

51. **Julian Hammond** has more than twenty years of experience in commercial and complex class litigation. Having been a Barrister in Australia, representing GlaxoSmithKline in the then-largest commercial litigation in Australia's history, Mr. Hammond transitioned his practice to California in 2010 and founded his own law firm, and has since become a leading California class action attorney. Mr. Hammond has obtained over 40 class action settlements and judgments over just the past 3 years, securing over $50 million in settlements for employees and consumers (and close to $100 million since 2010 in more than 80 class actions). Included among these was Mr. Hammond's success, with Ms. Brandler as second chair, securing judgment in a class action against the University of San Francisco in 2020, and his successful defense of that judgment before the Court of Appeal in 2023. Also notable was a $16.5 million settlement for approximately four million consumers against Apple in relation to its automatic renewal policies. Recently, Mr. Hammond has begun representing consumers and patients in various data privacy cases, including in cases against Cerebral, Inc., TaxAct, BetterHelp, NFHS Network, Watch AFL, Watch

NRL, and BBC America for disclosing their customer's medical, financial, and video viewing information to Meta through the Pixel.

52. Mr. Hammond earned his bachelor's degree from the University of New South Wales, and his J.D., *summa cum laude,* from the University of Technology. Mr. Hammond also received an LLM from New York University School of Law in 2001.

53. **Adrian Barnes**, who had devoted substantial time to this case[3] has over 12 years of experience successfully representing consumers and employees in class-action cases. During his time at HammondLaw, Mr. Barnes pursued litigation against a number of leading financial, video and healthcare companies for the unauthorized disclosure of customers' confidential financial, medical and viewing information. Mr. Barnes has represented clients before the National Labor Relations Board, the Public Employment Relations Board, and has litigated class actions to the Supreme Court. He has also obtained favorable settlements in multi-million-dollar class actions under California's wage and hour laws.

54. Mr. Barnes earned his law degree from Columbia Law School, where he was on the editorial board of the Columbia Law Review, was a James Kent Scholar, and received the Emil Schlesinger Prize for the student most proficient in labor law. Prior to law school, he earned a bachelor's degree in Rhetoric from the University of California, Berkeley, where he graduated *magna cum laude*, and a master's degree in English Literature from University College London.

55. **Polina Brandler** has over 11 years of complex class action experience and a total of 15 years of legal experience, having spent the first two and a half years of her career as a judicial law clerk. Ms. Brandler has a wealth of litigation experience, having litigated over 30 class actions, and worked on every stage of litigation, from case researching and investigation, pleadings and motion practice, expert discovery to depositions, through to mandatory settlement conferences and mediations, and recently successfully second chaired a class action trial against the University of San Francisco. Additionally, Ms. Brandler brings her formidable briefing skills to the table, being responsible for numerous motions and oppositions, including oppositions to motions to compel arbitration, and recent appellate briefs, in which HammondLaw was successful.

---

[3] Mr. Barnes is no longer with HammondLaw, P.C.

56. Ms. Brandler received her bachelor's degree, *cum laude*, in 2005 from Macaulay Honors College at the City University of New York, and her J.D. from the Benjamin N. Cardozo School of Law in 2009.

57. **Ari Cherniak** has been with HammondLaw since 2010 and has extensive class action litigation experience. Mr. Cherniak's assists in managing all aspects of the class action litigation at HammondLaw, including overseeing case calendars, advising on compliance with applicable rules including procedural rules, local rules, standing orders, and guidelines, and ensures the smooth operation of the cases from inception through to final approval. Mr. Cherniak has been appointed along with other members of the HammondLaw Team as class counsel in over 70 class actions since 2010.

58. Mr. Cherniak received his bachelor's degree from Towson University in 2007, and his J.D. from Tulane University Law School in 2011.

59. **Steven Greenfield** has over seven years of legal experience, and over 20 years of professional experience.[4] During his time at HammondLaw, Mr. Greenfield focused his practice on litigating privacy cases.

60. Mr. Greenfield earned his bachelor's degree from Yeshiva University in 1996, where he was valedictorian from the Sy Syms School of Business, his J.D. from the University of Pennsylvania Law School in 1999, where he graduated in the top 25% of his class, an LLM in taxation from the New York University School of Law in 2002, and an MBA from Columbia University in 2007.

## X. ATTORNEYS FEES

61. Plaintiffs will seek attorneys' fees in an amount of 25% of the Settlement Fund. As of July 30, 2025, HammondLaw has spent more than 570 hours working on this case for a total lodestar of over $456,000. HammondLaw will expend additional hours preparing for and appearing at the preliminary approval hearing, overseeing the notice process, including working with the Settlement Administrator on monitoring claims rates and on sending out reminder notices, responding to questions from the Class Members, preparing and filing the motion for final approval, responding to objections, preparing final

---

[4] Mr. Greenfield is no longer with HammondLaw, P.C.

approval motion, attending the final approval hearing, and overseeing the distribution of the settlement funds.

## XI. COSTS

62. HammondLaw has incurred $10,077.51 in costs and expenses in this litigation through to July 30, 2025. The following is a summary of these expenses, identified by the category of expense and the amount incurred:

| Category | Total Amount |
|---|---|
| Court Filing and Service Fees | $1,698.51 |
| Consulting expert fees | $2,800.00 |
| Research (Pacer, Lexis/Westlaw) | $5,579.00 |
| **Grand Total** | **$10,077.51** |

63. Costs incurred by Hedin LLP are set out in the concurrently filed Hedin Decl.

## XII. PROPOSED SETTLEMENT ADMINISTRATOR

64. Plaintiffs propose Angeion Group, LLC, as the settlement administrator.

65. Plaintiffs obtained competing bids from Angeion and one other, well-known, settlement administrator. The two settlement administrators each proposed generally similar notice and claims processes to the one the parties ultimately selected. Given that Class Members engaged in online transactions with Defendant and given that Defendant has email addresses for the substantial majority of the Class, direct notice will be provided by email, with two reminder notices after the initial notice.

66. Counsel for Plaintiffs independently evaluated each proposal and conferred with counsel for Defendants regarding the selection of the settlement administrator, and Plaintiffs then chose Angeion.

## XIII. PLAINTIFF HOANG TO'S EFFORTS ON BEHALF OF THE CLASS

67. Plaintiff To has agreed to take on the responsibility of representing the Class and has devoted substantial time and effort to this case. He discussed his claim with his attorneys, reviewed and readily accepted his duties as a Class Representative, reviewed documents filed in this case, promptly responded to calls and emails from his attorneys, looked for and shared documents with his attorneys, and was actively involved in the case.

68. Plaintiff To's claims are typical of the claims of the other Class Members and his interests are aligned with, and not antagonistic to, those of the other Class Members. Without his involvement and his willingness to represent the Class, this case and this settlement would not have been possible.

69. A brief description of the time and efforts devoted by Plaintiffs Heise and Mull on behalf of the Class is set out in the Hedin Declaration.

**XIV.   CY PRES BENEFICIARY**

70. The parties propose Electronic Privacy Information Center ("EPIC") as the cy pres recipient.

71. EPIC is a nationwide organization which addresses myriad issues affecting American consumers. It describes itself as a "public interest research center… seeking to protect privacy, freedom of expression, and democratic values in the information age."

72. Among the issues addressed by EPIC which are relevant to the Class Members' claims in the instant case are: advocacy for consumer data protection; advocacy for consumer privacy; and work on comprehensive privacy laws.

73. Neither Plaintiff Hoang To nor any attorney or employee at HammondLaw has any relationship with EPIC. There is no connection between Plaintiffs or HammondLaw, on the one hand, and EPIC, on the other, that could create the impression of any impropriety of any sort in the selection of EPIC as the cy pres recipient in this case.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on August 8, 2025.

/s/ Julian Hammond
Julian Hammond